---

(No. 11436.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAKE FALKOVITCH, Plaintiff in Error.

*Opinion filed ·October 23, 1917.*

1. CRIMINAL LAW—*an indictment for manslaughter need not allege that the killing was willful.* An indictment for manslaughter, under the statute, need not charge that the killing was both felonious and willful.

2. SAME—*an indictment for manslaughter need not allege particular kind of motor vehicle with which killing was accomplished.* The term "motor vehicle" has been given a definite meaning by the statute, and in a manslaughter case, where the deceased was run over by an automobile, the indictment need not describe the particular character or kind of motor vehicle with which the killing was accomplished.

3. SAME—*when objections to misconduct of juror and to State's attorney's argument come too late.* · Objections to the alleged misconduct of a juror, of which the defendant was informed during the trial, and to alleged prejudicial remarks of the State's attorney in his argument, cannot be reviewed in the Supreme Court when raised for the first time by affidavits in support of a motion for a new trial.

4. SAME—*when driver of automobile is guilty of criminal negligence.* A driver of an automobile is guilty of criminal negligence where he drives his car at a speed of more than fifteen miles an hour on a well traveled boulevard in front of a public school building, where the speed limit is ten miles per hour, with knowledge of such circumstances and of the fact that children are crossing the street on their way to school.

WRIT OF ERROR to the Circuit Court of Rock Island county; the Hon. WILLIAM T. CHURCH, Judge, presiding.

H. A. WELD, and C. S. ROBERTS, for plaintiff in error.

280 – 21

EDWARD J. BRUNDAGE, Attorney General, FLOYD E. THOMPSON, State's Attorney, and NOAH C. BAINUM, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error was indicted and convicted of involuntary manslaughter at the January term, 1917, of the circuit court of Rock Island county, and was sentenced to an indeterminate term in the penitentiary.

The indictment is in four counts. Omitting the formal beginning, the first count charges "that Jake Falkovitch, late of said county, on the 28th day of September, in the year of our Lord one thousand nine hundred and sixteen, at and within the said county of Rock Island, in the State of Illinois aforesaid, in and upon one Edwin Schernau, in the peace of the people then and there being in the public highway there, unlawfully, feloniously, recklessly and negligently did make an assault, and a certain motor vehicle then and there unlawfully driven and operated by the said Jake Falkovitch upon and along the said public highway in and against the said Edwin Schernau feloniously, unlawfully, recklessly and negligently did force and drive, and did then and there unlawfully, feloniously, recklessly and negligently force and drive the left rear wheel of said motor vehicle in and upon and against the chest of him, the said Edwin Schernau, then and there being running in the said public highway, and him, the said Edwin Schernau, did thereby then and there give in and upon his chest divers mortal wounds, fractures and contusions, of which said mortal wounds, fractures and contusions the said Edwin Schernau then and there languished a short time and on the same twenty-eighth day of September, in the year of our Lord one thousand nine hundred and sixteen, there died; and so the grand jurors aforesaid, upon their oaths aforesaid, do say and present that the said Jake Falkovitch him, the said Edwin Schernau, in manner and by the

means aforesaid, feloniously, unlawfully, recklessly and negligently did kill and slay, contrary to the form of the statute in such case made and provided and against the peace and dignity of the said People of the State of Illinois."

The other three counts are similar in wording and in character to the foregoing count, the principal difference being that in the last three counts the public highway is specifically alleged to be Seventh avenue in the city of Rock Island, with the further specific averment that plaintiff in error at the time of the killing was unlawfully driving and operating his motor vehicle at a greater rate of speed than is reasonable and proper, having regard for the traffic and the use of the way, and so as to endanger the lives or limbs of persons upon the said highway, and at a time when the said Edwin Schernau was crossing said highway and in full view of plaintiff in error, and without giving the deceased any warning of his approach, the rate of speed being stated as twenty-five miles an hour.

It is urged that the court erred in overruling the motion to quash the indictment for three grounds assigned by plaintiff in error: (1) That the lethal instrument was not defined with sufficient definiteness; (2) that it is not charged that the killing was willful; and (3) that it fails to set forth the specific acts relied upon as constituting the crime.

The indictment sufficiently and definitely charges the crime of manslaughter. Our statute defines manslaughter as "the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever." Involuntary manslaughter, by the provisions of the statute, "shall consist in the killing of a human being without any intent to do so, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner." There are no words or special provisions of our statute with reference to manslaughter, either in the definition of the crime itself or elsewhere in the statute, that require that the in-

dictment shall charge that the killing was both felonious and willful, although it is common practice to employ both words in drawing indictments for manslaughter. In Bishop's New Criminal Procedure (vol. 2, sec. 543,) it is stated: " 'Willfully,' though common in the indictment for manslaughter, is believed not to be here necessary. In reason it is not." The word "feloniously" is stronger than the word "willfully." The doing of an act feloniously is the doing of it *malo animo.* An act done feloniously is done with the deliberate purpose of committing a crime, and an act done feloniously, unlawfully and recklessly, as charged in this indictment, must necessarily have been done willfully. The term "motor vehicle" has been given a definite and fixed meaning by the statute in this State which plaintiff in error is definitely charged with violating. (Hurd's Stat. 1916, chap. 121.) Paragraph 269*a* of that chapter provides: "That whenever the term 'motor vehicle' is used in this act, it shall be construed to include automobiles, locomobiles, and all other vehicles propelled otherwise than by muscular power, except motor bicycles, traction engines and road rollers, the cars of electric and steam railways and other motor vehicles running only upon rails or tracks." Paragraph 269*j* of the same chapter provides: "No person shall drive a motor vehicle or motor bicycle upon any public highway in this State at a speed greater than is reasonable and proper having regard to the traffic and the use of the way or so as to endanger the life or limb or injure the property of any person." The statute further provides that if the rate of speed of any motor vehicle operated upon any public highway where the same passes through the closely built-up business portion of any city, town or village exceeds ten miles an hour, or if it exceeds fifteen miles an hour in the residence portion of such incorporated city, town or village, such rates of speed shall be *prima facie* evidence that the person operating such motor vehicle is running at a rate of speed greater than is reasonable and

proper, having regard to the traffic and use of the way, or so as to endanger the life or limb or injure the property of any person. The statute then provides a penalty for its violation in the sum of $200.

Plaintiff in error is presumed to have known the provisions of this statute, and that a Ford automobile, which the evidence shows he was driving and with which the deceased was struck and killed by him, comes clearly within the statutory definition of the term "motor vehicle." It was not necessary for the indictment to describe the particular character or kind of the motor vehicle with which the killing was accomplished. The defendant was informed by the indictment of the particular time and place that the killing occurred, and was as well informed of the crime with which he was charged as if it had been definitely charged that the act was committed by the felonious, unlawful and reckless driving of an automobile. Our Criminal Code provides that every indictment or accusation of a grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statute creating the offense, or so plainly that the nature of the offense may be easily understood by the jury. Other jurisdictions have sustained indictments for manslaughter which charged the crime to have been committed with a "motor vehicle, commonly called an automobile," or as done with "a certain automobile." (*Schultz* v. *State,* (Neb.) 130 N. W. Rep. 972; *State* v. *Watson,* (Mo.) 115 S. W. Rep. 1011.) The term "gun" includes a variety of fire-arms. The rule is generally recognized that in describing the means of killing, if the nature of the instrument is given as a "gun" it is not necessary to state the kind of a gun. (Wharton on Homicide,—3d ed.—p. 852.) The indictment in this case sets forth the specific acts relied on with sufficient certainty and definiteness to fully apprise the defendant of the charge made against him, and the court did not err in overruling the motion to quash.

It appears from the evidence in the case that Seventh avenue, in the city of Rock Island, is one of the busiest thoroughfares in the city. It connects that city with Moline and upon that avenue traffic comes into Rock Island from Davenport, Iowa. It is a sort of double street, with a series of ornamental boulevards down the center, except at the intersections, containing ornamental shrubbery, and is about one hundred feet in width. There is a street car track on either side of and next to the boulevard, occupying about nine feet of the street. The street is paved on both sides of the boulevard, with brick where the street car lines run and with asphalt between the street car lines and the outside curbs of the street, and the intersections are paved with asphalt. Forty-first street is paved with asphalt. The line of travel for vehicles is between the street car tracks and the outside curbs, being about seventeen feet wide, the distance from each outside curb to the curb of the boulevard next to it being twenty-six feet. Forty-first street runs north and south and crosses Seventh avenue at right angles and is sixty feet wide. The paved portion of Forty-first street is thirty feet wide from curb to curb, but it is paved the full sixty feet in width at the intersection. The ornamental boulevard in Seventh avenue is sixteen feet wide. The entire block on the south side of Seventh avenue from Forty-first to Forty-second streets is occupied by a public school building. At the intersection of Fortieth street and Seventh avenue,—just one block west of the intersection of Forty-first street and Seventh avenue,—is a sign-board which reads, "Public school—Speed limit ten miles an hour." Seventh avenue from Thirty-eighth street to Forty-sixth street is a combined business and residence district. On the north side of said avenue between those limits are a number of small retail stores, averaging one to each block between Thirty-eighth street and Forty-second street. With the exception of the block on which the school building is situated Seventh avenue is closely built up with stores and residence build-

ings, all the residences being occupied at the time of the accident. On the morning of September 28, 1916, Edwin Schernau, a six-year-old boy who was being kept by his father at Bethany Home Orphanage, situated in said city northwesterly from the scene of the killing, was on his way to attend school at said public school building. He, with three other small children, was traveling east on the north side of Seventh avenue. As they approached Forty-first street, where it was necessary to cross the intersection with Seventh avenue to reach the school building, a funeral procession composed entirely of automobiles was passing westward on the north side of Seventh avenue and for some time had the crossing blocked. The three children with the Schernau boy seeing an opening in the procession ran across the street, but the Schernau boy, apparently afraid to venture across, waited on the north side of the avenue on the curb on the west side of Forty-first street. While thus waiting there came another break in the procession just at the intersection of said streets, and the boy started on a run across the intersection to the school building. The bell had rung for nine o'clock and the children were hurrying into the building. On the south side of Seventh avenue three motor vehicles were going east. One of them was a truck loaded with lumber and driven by Harry Bauer, who was accompanied by his brother, William. Another was a black taxi-cab. The third was a Ford touring car driven by plaintiff in error as a jitney, with three passengers in it. Plaintiff in error and the taxi driver both passed the truck about the middle of the block between Fortieth and Forty-first streets. Just as the Schernau boy was crossing the intersection plaintiff in error's car struck him, knocking him to the pavement and dragging him a distance of from twenty-five to thirty-five feet southeasterly to the curbing on the south side, at a point about ten or fifteen feet east of the rounded portion of the curb as it turned south at Forty-first street, the automobile describing the arc of a

circle as it swerved to the right. The front wheels of the
car passed clear over the curb, which is about six inches
high, and the left rear wheel of the car carried the body
clear up to and pinched it against the curb, according to
one of the witnesses for the People. According to the
plaintiff in error's own testimony the instant before he
struck the boy he turned his car to the right and threw on
the brakes, and the car skidded from the point where it hit
the boy clear over to the point of the curb, and the front
wheels ran up over the curb and about two feet beyond its
north edge. The automobile, when stopped, was pointing
north and south. According to the testimony for the Peo-
ple the boy was struck very close to the south rail of the
street railway and the body dragged in front of the rear
wheel to the pavement, one of the People's witnesses stat-
ing that he saw where the body was dragged on the pave-
ment for a distance of about thirty-five feet. While plain-
tiff in error and his witnesses claimed that the car was
running about eight or ten miles an hour and on a line
about midway between the south rail of the railway and
the south curb, yet the plaintiff in error stated on cross-
examination, "When I hit him with the car he was run-
ning near the track." He also stated that his car did not
drag the boy over three or four feet, yet he admitted that
the boy was in front of his left rear wheel, near the south
curb, when the car stopped. The evidence on behalf of
the People, as testified by two of the witnesses, was that
the jitney car was running "every bit of twenty miles an
hour" or "not less than twenty miles an hour," while a third
witness estimated it at twenty miles an hour. As it passed
the truck loaded with lumber, and up to the point where
the boy was struck, the two Bauers testified that their truck
was running at a speed of thirteen miles an hour, as shown
by their speedometer, and that the jitney and black taxi-cab
were racing, the jitney trying to pass the taxi-cab.

We think the evidence clearly shows the guilt of plaintiff in error. His testimony that he shut off the power of his car and that his car simply coasted up to Forty-first street from the middle of the block west of it, which is two hundred and ten feet wide, is not at all supported by the evidence. The physical fact that his car, with the rear wheels locked by the brakes and not turning but skidding from the moment the boy was struck, ran for a distance of from twenty-five to thirty-five feet and over and upon a curb six inches high, is entirely inconsistent with his contention and is proof that his car was moving at a very high rate of speed,—probably much greater than twenty miles an hour,—although the pavement that morning was wet and slippery on account of rain that had previously fallen. He admits that he was well acquainted with all of the surroundings at that point on the street; knew of the fact that the school building was just ahead of him and that the school was in progress and school children were on their way to the building; knew all about the signboard at Fortieth street; saw the funeral procession as he was approaching Forty-first street; saw the boy from the middle of the block west of that street and until he was struck by the car, and saw him running across the intersection towards the school building. All these facts should have suggested caution on his part while moving up to that intersection, and he should have had his car moving at such a speed that he could easily have controlled it. The evidence demonstrates to a moral certainty that he was driving his car at a very high, reckless and dangerous rate of speed, in violation of the law, and that the boy's death was occasioned thereby.

Plaintiff in error sought to discredit one of the witnesses, James G. Blythe, by the testimony of himself and another witness, to the effect that Blythe, on the morning of the accident and afterwards, had stated, in substance, that plaintiff in error was not to blame for the death of the

child, and later on said in other conversations that plaintiff in error was a "damned Jew" and ought not to be running jitney busses, and that the Jews were no good and were "hurting us all in business." This testimony was denied *in toto* by Blythe, and the evidence shows that he was not in the jitney business but was in the advertising business. His testimony does not disclose any animosity toward plaintiff in error and was even less hurtful to plaintiff in error than that of the Bauer brothers. The positions of the People's witnesses on the morning of the accident were much more favorable for judging the speed of the automobile than those of plaintiff in error, as the People's witnesses all saw the automobile before it passed the truck of the Bauers and while it was passing it and them, and saw it all the time from the time it passed the truck until the boy was hit. The two witnesses for plaintiff in error were jitney drivers who were in the funeral procession and saw the car of the plaintiff in error as it approached Forty-first street from positions in the funeral procession east of Forty-first street and on the north side of Seventh avenue. One of them states positively that he did not see or notice plaintiff in error's car until it was within fifteen or twenty feet from the point where it struck the boy.

Affidavits were filed in support of the motion for new trial on the ground of the misconduct of one of the jurors, who was alleged in the affidavits to have talked privately with one of the principal witnesses for the prosecution just after that witness had testified, and that that juror had examined the locality where the accident occurred and gained information in that way out of the presence of the accused. Counter-affidavits were filed by the juror and by two other persons, including said witness, from which the court was thoroughly warranted in finding that the conversation of the juror and the witness had no relation whatever to the trial, and that the juror merely passed the scene of the killing from his home to the court house as he went to and

from it during the progress of the trial, and that he did not make any view of the locality of the accident for the purpose of gaining any information in connection with the trial ·or otherwise. Besides, the fact that during the progress of the trial the juror had a conversation with one of the witnesses and that he was at the locality where the killing occurred was known to plaintiff in error and his attorney and was not brought to the attention of the court until after the motion for a new trial was made.

Plaintiff in error is also in the same position in regard to the alleged prejudicial remarks of the State's attorney during the argument of the case, in which he is alleged to have said to the jury, in substance, that if plaintiff in error was convicted he would do what he could to have the term of imprisonment cut down as short as possible. No objection was made to the remarks of the State's attorney at the time they were alleged to have been made, and the court's attention was never called to any such remarks except by affidavits on motion for a new trial. Such a question cannot be reviewed when raised for the first time in the trial court by affidavits in support of a motion for a new trial. As there was no objection made to the remarks and no ruling by the court there is no action of the court to be reviewed. *Mayes* v. *People,* 106 Ill. 306; *People* v. *Spira,* 264 id. 243.

The People's third instruction is erroneous because it stated, in substance, that certain rates of speed greater than those mentioned in the statute would be proof of negligence. By the statute they are only made *prima facie* evidence of negligence. This instruction did not direct a verdict. While the instruction was erroneous we do not think plaintiff in error was prejudiced thereby. The instructions given for plaintiff in error plainly informed the jury that before they could find the defendant guilty they must not only find that the deceased was struck by the defendant's automobile and thereby killed, but they must also find (1) that at the time

the boy was killed the defendant was running his automobile at a rate of speed greater than allowed by law, and must further find from the evidence, beyond a reasonable doubt, that he was negligently running his automobile in reckless disregard of human life, at a time and place where so running was likely to destroy life, and that his act in that respect was so wanton, reckless and grossly negligent as to amount to criminal negligence; (2) that the defendant must not only have been committing a violation of some law or ordinance with reference to the operation of automobiles, but such a violation of law as by its nature and consequences was apparently likely at that time and place to cause such an injury as Edwin Schernau suffered, and that it was committed by the defendant in utter and reckless disregard of such consequences, and that as a natural result of such unlawful act Schernau was killed; (3) that the fact, if it be a fact, that the defendant, at the time and place where the deceased, Edwin Schernau, received the injury which caused his death, was driving his automobile at a rate of speed greater than is allowed by law, and in consequence thereof the injury occurred, is not, of itself, sufficient to justify the finding that the defendant is guilty. The foregoing propositions were repeatedly given to the jury, who were then given a definition of criminal negligence in this language: "By the term 'criminal negligence,' as used in these instructions, is meant not simply such negligence as might be the foundation of a suit for damages by the person injured thereby, but something more than that. Negligence, to become criminal, must be reckless, wanton, and of such a character as shows an utter disregard of the safety of others under circumstances likely to cause injury." The jury were then instructed, as a closing part of such instruction defining criminal negligence, that unless they believed from the evidence, beyond a reasonable doubt, that the defendant was guilty of criminal negligence as defined in the instruction, and that the boy was killed as the direct

result of such criminal negligence, they should find the defendant not guilty. We do not think it is possible that the jury could have been misled by the erroneous instruction aforesaid, after a careful reading and consideration of all the instructions in the case.

It is true, as contended by plaintiff in error, that there was a technical error in the court's giving the People's sixth instruction, which told the jury, in substance, that the intent with which an act is done may be proved by direct and positive testimony, etc. The instruction simply had no place in this case, and it was not applicable in a case where involuntary manslaughter is charged. The jury, however, could not have been misled by it, because there was no claim and no evidence of any intent on the part of plaintiff in error to kill the deceased. It was not necessary to prove intent to kill, to convict plaintiff in error of involuntary manslaughter. It is therefore immaterial whether the jury did or did not find that there was such an intent, and the instruction was simply inapplicable and could not figure in the question of guilt or innocence of the accused.

We have these propositions as to the giving of the People's erroneous third instruction: The jury were improperly told by that instruction that proof of greater rates of speed than those mentioned in the statute in passing on the public highway through a city or village is proof of negligence, but following that instruction the jury were further and emphatically told that proof of negligence is not sufficient to warrant the conviction of plaintiff in error. Under such instructions he could not have been convicted of simple negligence or for a simple violation of the statute, as argued by his counsel. We must add to this the further proposition that there can be no sort of question, in our judgment, that plaintiff in error, from the time he passed the truck upon which the Bauers were riding and up to the place where the boy was hit, was driving his car at a much greater rate of speed than fifteen miles an hour, and

was not only *prima facie* guilty of violating the law and guilty of ordinary negligence, but was, beyond all reasonable doubt, actually guilty of criminal negligence. There could have been no time or place found within the limits of said city that would have been more suggestive to a driver of an automobile of care and caution in driving than the time and place of this killing. All the surroundings at that place at that time were equally suggestive of caution. We do not think that plaintiff in error could reasonably expect another or different verdict than the one upon which he was sentenced, if the cause were re-tried.

There is no reversible error in the record, and the judgment is affirmed. ·                    *Judgment affirmed.*