PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. SANTIAGO RODRÍGUEZ ROSARIO, Defendant and Appellant.

No. 5322.   Argued March 21, 1934.—Decided September 29, 1934.

*Mariano Acosta Velarde* for appellant. *R. A. Gómez, Fiscal,* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

Santiago Rodríguez Rosario was charged with involuntary manslaughter. It is alleged in the information that about February 20, 1932, the said Santiago Rodríguez Rosario, Eduardo Pérez Rivera and Sebastián Mejías Carrero, while operating and driving locomotive 85 of the American Railroad Co. of Puerto Rico, the appellant being the engine driver, owing to the negligence, carelessness and want of prudence and circumspection of the said defendants in operating and driving the engine, in the Higüey section of the municipal district of Aguadilla, ran over José Alers Valentín, a human being, who died on February 26, 1932, from the wounds inflicted on him.

The defendants moved for a bill of particulars regarding the facts constituting the negligence, carelessness or want of prudence and circumspection charged against them. The district attorney filed a bill of particulars with additional allegations which he made part of the information and which, as regards the appellant, reads as follows:

"That Santiago Rodríguez Rosario, at the place and on the day mentnoned in the information, handled, drove and operated locomotive 85 of the American Railroad Company of Puerto Rico at full speed, it being incumbent upon him to slow down when approaching the crossing where the human being José Alers Valentín was struck, where the railroad track is crossed by a public road with much traffic at all hours, then and there and while the said José Alers Valentín was walking over the said crossing, the said defendant, carelessly and negligently and being aware of the aforesaid circumstances, refused and failed to slow down the said engine, thus causing together with the other codefendants the death of José Alers Valentín in the manner stated in the information."

The appellant demurred to the information on the ground that the facts as set out therein do not constitute a public offense chargeable against him. The demurrers were overruled. When the prosecution rested, Eduardo Pérez Rivera, the locomotive's pilot, was acquitted. After all the evidence was heard the case went to the jury who gave a verdict acquitting the stoker Sebastián Mejías Carrero and convicting the engine driver Santiago Rodríguez Rosario of involuntary manslaughter.

■■ The defendant and appellant pleads in the first place that the court erred in overruling the demurrers to the information.

During the hearing of the case in this court the attorney for the appellant emphatically alleged that as the original information was defective the bill of particulars did not fill the omissions that appeared in the said information. It is to be noticed that the bill of particulars was served on motion of the defendant himself and that the district attorney stated that he made the said additional allegations in order that

the same be made part of the information. We think, however, that it is unnecessary to decide the question raised orally by the attorney for Santiago Rodríguez Rosario, because, to our mind, the information originally brought is sufficient to impute the commission of involuntary manslaughter charged against the defendant.

Section 328 of the Penal Code provides that every conductor, engineer, brakeman, switchman, or other person having charge wholly or in part of any railroad car, locomotive, etc., . . . or other. person wholly or in part charged with the duty of dispatching or directing the movements of any such car, locomotive, etc., . . . who, through gross negligence or carelessness, suffers or causes the same to collide with another car, locomotive, etc., . . . . whereby the death of a human being is produced, is punishable by imprisonment in the penitentiary for a maximum term of five years. Section 203 of the same statute states that manslaughter is involuntary when it occurs in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. Practically the original information follows the language of the statute. It is therein alleged that defendants Santiago Rodríguez Rosario, engine driver, Eduardo Pérez Rivera, conductor, and Sebastián Mejías Carrero, fireman, were operating, and had charge of, a locomotive, and it is stated that due to the negligence, carelessness and lack of caution and circumspection on the part of said defendants in operating and directing the movements of the aforesaid engine, José Alers Valentín, a human being, was struck and received injuries from which he died. We agree that the information might have been more specific, but in our opinion it sets forth facts sufficient to acquaint the defendant with the nature and character of the offense charged against him, and we do not think that it is absolutely necessary to specify in detail the

facts constituting the carelessness, negligence or lack of caution and circumspection.

In *Schultz* v. *State,* 130 N.W. 973, the Supreme Court of Nebraska expressed itself as follows:

"The record also discloses that the defendant fully understood the nature of the charge against him, and conducted his defense in such a manner as to have exonerated himself from criminal liability had the jury believed his evidence. A like question was before the Supreme Court of Missouri in *State* v. *Watson,* 216 Mo. 420, 115 S. W. 1011, upon a similar information, in which the defendant was charged with killing a pedestrian while carelessly, recklessly, and negligently running his automobile over and upon a certain street in the city of St. Louis."

The court quotes the conclusions of the Supreme Court of Missouri and finally says that the information in the case was sufficient to charge the defendant with the offense of which he was convicted.

The following is a transcription of what the Supreme Court of Missouri said in *State* v. *Watson,* supra, cited by the Nebraska court:

"Directing our attention to the first proposition as to the sufficiency of the information to support the judgment, we find that the information charges the defendant with the commission of manslaughter of the fourth degree, and is predicated upon the provisions of Section 1834, Revised Statutes 1899, which provides:

" 'Every other killing of a human being by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not excusable or justifiable, or is not declared in this chapter to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree.'

"The question involved in this proposition seems to be one of first impression so far as the adjudications of this court are concerned. Counsel representing both the State and the defendant have not directed our attention to any case predicated upon a similar state of facts, nor have we been able, after diligent search, to discover any adjudications which are specially applicable to the point involved; hence the solution of this proposition must be sought by the application of well-settled principles to the proposition confronting us.

"It is fundamental that an indictment or information predicated upon the provisions of a statute, must charge the offense in the language of the statute, and the allegations in the indictment or information must be sufficient to fully inform the defendant of the nature and character of the offense he is called upon to answer upon his final trial.

"It is sufficient to say upon this proposition that, applying this fundamental principle of pleading in criminal causes, in our opinion this information sufficiently charges the offense of which the defendant was found guilty.

"The statute upon which this information is based provides that the killing of a human being by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not excusable or justifiable, or is not declared in this chapter to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree.

"The facts upon which this information is predicated were the negligent use and operation of an automobile, the propelling of which is universally recognized as being attended with great danger to the traveling public who make use of the streets. This information charges that defendant carelessly, recklessly and with culpable negligence operated and propelled this automobile. It charges that this defendand was then and there in charge and control of and operating and managing a certain automobile, moving and being propelled upon Locust street, a public highway of the said city of St. Louis, and that the said Jesse Watson then and there, at said city of St. Louis, on said thirty-first day of October, one thousand nine hundred and seven, feloniously, carelessly, recklessly and with culpable negligence, did drive, propel and force said automobile with great force and violence at, against and upon said Christine Musick. Then follows the charge of the infliction of the wounds by reason of such carelessness, recklessness and culpable negligence, and it is again charged that the defendant carelessly, recklessly and with culpable negligence, did with great force and violence throw and cast said Christine Musick to the ground and pavement; and drive, propel and force two of the wheels af said automobile against, upon and over the head and body of said Christine Musick, thereby inflicting certain designated wounds and bruises, from which the said Christine Musick died.

"This, in our opinion, is a sufficient charge and fully informed the defendant of the nature and character of the offense he was

called upon to answer. If was not, in our judgment, essential that the information should undertake to set out in detail in what such carelessness, recklessness and culpable negligence consisted, but the charge that he operated and propelled this automobile along a public street carelessly, recklessly and with culpable negligence was in effect notifying the defendant that he was not using, operating or propeling his automobile in accordance with the law or the ordinances of the city regulating the use and operation of such machines.

"Manifestly the defendant knew that he would have to meet the charge of carelessness, recklessness and culpable negligence in the operation of his automobile, and in meeting such charge doubtless his only defense would be that he operated and propelled such automobile in accordance with the laws and ordinances of the city, duly passed, regulating the running of such vehicles. The defendant could not have been misled by this charge. He could not have been taken by surprise. Under the allegations in this information he must have known that the State would undertake to develop every fact which tended to establish any sort of negligence, carelessness or recklessness in the operation of that machine.

The grounds set forth by the Supreme Court of Missouri to show the sufficiency of an information very similar to the one demurred to in the instant case seem to us acceptable. The defendant can not complain of having been misled. By virtue of the charges filed against him he was advised that negligence, carelessness and want of circumspection and caution in operating the locomotive were. imputed to him. This as to the original information. Then by the bill of particulars the defendant was advised that the negligence consisted in operating at full speed the locomotive driven by him upon a road open to the public who continuously travel over the same, and in refusing to reduce the rate of speed of the said engine. This specification which confines the alleged negligence, carelessness and want of caution and circumspection to the fact of the defendant having refused to reduce the speed of the engine, has received from us careful consideration. The rate of speed at which a locomotive should be run when traveling through a rural zone depends on a number of circumstances; as the condition of the cross-

ing, its location, any possible danger, and every other element tending to determine whether or not a person of average circumspection is justified, under the circumstances, in driving an engine at a certain speed. It is stated in the bill of particulars that it was incumbent on the engine driver to slow down. Broadly speaking, we do not think that such assertion can be established. It has been held that in the absence of a statute and under the precepts of the common law, the principle that a railroad company should make use of its franchise with due regard to the safety of its passengers and of such persons as may cross the track over a public road requires from said company, when establishing the rate of speed at which its trains could be run, to exercise due care not only as regards the safety of its passengers but also of all persons who cross its tracks at public crossings using ordinary care.

In *Ferrer & Son* v. *American Railroad Co.*, 39 P.R.R., 36, 39, 40, this court expressed itself as follows:

"Under the authorities, as we read them, at such a crossing, which is not distinctly a public one, the duty of the railroad company is to give a signal and to use ordinary care. There is no requirement of general law that in these suburban places the trains should reduce their speed.

"Yet, the principal holding of the court below was that the accident was due to the failure of the defendant to reduce its speed. The court based this holding on the Act of december 6, 1917.

" *     *     *     *     *     *     *

"The bare inspection of this Act makes it clear that the duty of reducing speed arises only at street crossings, and that the whole Act applies to crossings recognized as public roads. In no manner is the road in question a public one within the meaning of this statute."

In *St. Louis-San Francisco R. Co.* v. *Prince*, 71 A.L.R. 357, 365, decided by the Supreme Court of Oklahoma, the following instruction to the jury was approved by the court:

"In reference to the speed of the train, you are instructed that in your determination as to whether or not the defendant company was careless and negligent in running said train at such a speed as

you may find from the evidence the same was operated at the time it approached and crossed the crossing in question, you may take into consideration the location of the crossing and all other surroundings and circumstances whether or not said crossing was an exceptionally dangerous crossing, and from all the facts and circumstances in evidence in this case determine whether or not an ordinarily prudent person, under the same or similar circumstances, would have operated said train at the speed at which you may find said train was operated at and near said crossing in this case.''

After transcribing the foregoing instruction, the Supreme Court of Oklahoma expressed itself as follows:

''The general rule is that, in the absence of statute regulating speed of trains in the open country, there is no limit upon the speed at which trains may be run, except that of a careful regard for the safety of trains and passengers. *Cross* v. *Ry. Co.*, 120 Kan. 58, 242 P. 469; *Mulvaney et al.* v. *N. Y. Cent. Ry. Co.*, 233 Mich. 350, 206 N. W. 536, 537, citing *Robinson* v. *Ry. Co.*, 79 Mich. 323, 44 N. W. 779, 780, 19 Am. St. Rep. 174.

''In the latter case, it was said: 'It is to be presumed that the defendant had complied with the provision of the statute in regard to fencing its road, and constructing this crossing with due regard to the safety of persons and property passing over it, and providing its engine and cars with the proper appliances. Having done this, it was entitled to the use of its road for the passage of trains at all times, to increase the speed of its regular trains when behind time, and to run special or wild trains whenever its business required. The law did not limit the rate of speed of its trains. The business of the country demands of railroads rapid transit, both for persons and property. It has nowhere been held that a speed of even 60 miles an hour is negligence, when a train is running through the country outside of villages and cities, or through a sparsely settled community. It is well known that trains are now being run in many parts of the country at the rate of 50 to 60 miles an hour.'

''*Mulvany et al.* v. *N. Y. Cent. Ry. Co.*, *supra*, after quoting the above rule, said: 'Like most rules, this one has its exceptions . . .'

''The exceptions to the rule are recognized in this state, as is shown in *St. Louis–San Francisco Ry. Co.* v. *Rundell*, *supra*, wherein the rule stated in 22 R.C.L. 947, is quoted with approval, which is: 'A rate of speed that would be entirely safe under some conditions may, however, be recklessly dangerous under other conditions, and

it is generally held that it is for the jury to determine whether or not the speed at which a train was operated was negligent under all of the circumstances.'

"It is then said: 'The question of whether 40 miles an hour was an excessive rate of speed to operate a train coasting down grade, without making any notice, without the ringing of the bell or blowing the whistle, when approaching a country crossing, at a place of much travel, where the view from one direction was obstructed, where the crossing was in bad condition, as heretofore described, was a question of fact for the jury, and not a question of law for the court. It is not such a state of facts upon which all reasonable men would reach the same conclusion.'

"The general rule should be adhered to, and the exception applied only in a proper case. The question was properly submitted to the jury by an instruction which fairly stated the law, and there was no error therein."

In *Missouri, K. & T. Ry. Co. of Texas* v. *Luten,* 203 S.W. 909, decided by the Civil Court of Appeals of Texas, it was said:

"The undisputed evidence shows that the train which struck and killed E. E. Luten was running 35 or 40 miles an hour as it approached this crossing, and that a dense fog prevailed. The crossing, it is true, was in the country; but it was a public one, in the sense that it was commonly used by pedestrians and persons traveling in wagons, buggies, and other vehicles, and a place where the operatives of appellant's train might expect persons to be at any time. In approaching such a crossing, although it be in the country, railway companies have no right, regardless of the danger to persons that may be lawfully using the crossing, to operate its trains at such speed as they see proper. Although the place of the accident is in the country, and there is no statute regulating the speed of trains, yet negligence may be evidenced by the speed at which the train is being propelled, when considered 'in connection with the place of the accident and the circumstances surrounding it.' It was the duty of appellant's servant on the occasion in question to exercise ordinary care, and whether they were exercising such care in the speed of the train under the circumstances of the situation was a question for the jury. The case of *Railway Co.* v. *Langham,* 95 S. W. 686, cited by appellant, does not, in our opinion, announce a contrary rule. Instead, the rule as stated here is distinctly recognized."

It can not be said that the criterion held by the Court of Civil Appeals of Texas is at variance with the general doctrine established by the jurisprudence. It rather points out and specifies the restrictions required by the safety of the public so that trains should not be run at an excessive speed at crossings when circumstances make it advisable to drive moderately in order to protect those making use of such crossings. That is to say, the absence of a statute setting a limit to the speed of trains in the open country when approaching a crossing does not warrant, when speeding up, the negligent and careless driving, disregarding the life and safety of the persons who might be crossing, where it is advisable by circumstances to slow down.

Now, do such special circumstances as make it advisable to slow down concur in the instant case? If so, has it been shown that the defendant failed to reduce the speed at the time of going over the crossing and that his negligence, if any, is such as to bring along with it criminal responsibility? These are questions that necessarily lead us to a consideration of the last two errors assigned by the defendant. It is claimed that the verdict is contrary to the evidence and that the latter is insufficient at law to convict the defendant.

We will begin with a description of the place of the accident, bearing in mind the evidence heard. It is alleged in the bill of particulars that the place of the accident is the crossing of a public road and the railroad track. It appears from the evidence for the prosecution as well as from that for the defendant that the track is crossed by the road leading to the estate of one Mejías where there are several houses. At the entrance to the above estate there is a gate and at a certain distance from it there is a sign with the words: ''Peligro–Prohibido el paso.––Danger–No trespassing.''

According to the testimony of Melitón Rivera the crossing is approached by a small curve hiding its view. Witness Ramón Gelabert, assistant civil engineer to the American Railroad Co. of Puerto Rico, testified that there is an eighty-

five-meter straight piece or road in the direction Mayagüez-Aguadilla immediately before crossing the road or lane leading to the estate of Mejías, and that a person standing next to the gate within the railroad ground two and one half meters from the track can see a moving train coming from Mayagüez 105 meters away. It was also stated by said witness that said road is not available for automobiles or carts and that it can only be used by pedestrians and beasts. The district attorney maintains that according to the evidence the signs already mentioned are for the purpose of preventing the passing up and down by the track, that is, to the right and left of the road, but not over the road which crosses the track. The evidence for the defendant tends to show that it was prohibited to pass over said ground in any direction either parallelly or diagonally. Engineer Gelabert testified that the road ends at the estate of Mejías about twenty meters from the track. It appears from the evidence that the people living on the property used to pass over the track in order to reach the road. There were in that estate a number of houses amounting to ten according to some of the witnesses and from fifteen to twenty according to others. It is a fact that some people used to pass over that place and it must logically be inferred that the railroad company authorized the traffic, because Mejías and his laborers had the right of egress from his estate and according to the evidence introduced this was the road enabling them to come out.

Melitón Rivera stated that the residents of the neighborhood and the owner himself of the estate used to pass often over that road at all hours. The decedent José Alers Valentín used to come out of the said estate, where he lived, on his way to Central Coloso, and between one and two o'clock in the afternoon of February 20, 1932, while crossing the track, was struck by locomotive 85 coming from Mayagüez and died from the injuries received. Engineer Gelabert stated that the word "danger" that appears on the signs is used because of accidents that might occur by reason of the traffic, and that

dangerous places are numberless, as for instance, the approaches to a bridge, a curve, a steep grade, a tunnel, a road crossing, etc.

We have carefully considered the circumstances surrounding the accident and are not convinced that the defendant is criminally liable. Melitón Rivera mentioned a small curve that hid the view. Engineer Gelabert stated that the track is straight for eighty five meters just near the crossing. He also testified that there is a grade when approaching the said crossing from Mayagüez towards Aguadilla. All the witnessts for the prosecution testified that no signal was sounded and that they saw the locomotive when the accident took place. The witnesses for the defendant testified that the whistle and the bell were sounded. The jury rendered a verdict of guilty. It is to be presumed that the witnesses for the defendant were not believed by the jury. It is not alleged in the bill of particulars that the defendant failed to blow the whistle. The only fact charged is that he failed to slow down. The failure to sound the alarm referred to, however, is an element to be considered where it is sought to determine whether or not there was negligence in failing to slow down. This precaution is not always obligatory where a train approaches a crossing in the open country, unless it is so required by the circumstances. In the case at bar the witnesses who mentioned the speed of the engine did not see the locomotive before the collision occurred. How could they notice that the defendant failed to slow down?

In *St. Louis, I. M. & S. Ry. Co.* v. *Kimbrell,* 163 S.W. 516, the accident took place in the town of Beebe at a street crossing. It was alleged, among other facts, that the train was running at a great and unusual rate of speed when going through the town of Beebe and that no signal was sounded when approaching the crossing. Referring to the speed the Supreme Court of Arkansas said:

"The unusual speed of the train was a proper element of consideration under the circumstances of this case, though the speed of

the train alone would not be sufficient to establish liability, if all other precautions were observed by those in charge of the train. In *Ford* v. *St. Louis,* I. M. & S. Ry Co. 66 Ark. 363, 50 S. W. 864, Judge Riddick, speaking for the court, said: 'Public convenience and necessity, of course, require that railroad trains should run at a high rate of speed, and the mere fact that a train was running fast at the time of striking an animal is no proof of negligence on the part of the company when unconnected with other facts tending to show that it was negligence under the circumstances to run at such speed, for trains are expected to run fast. But when the accident happens in a city or populous town, the circumstances then may be such that the jury would be justified in finding the company guilty of negligence in running its trains at a great and unusual rate of speed, and this is certainly true when the statutory signals are not sounded for the different street crossings.''

It is to be noticed that the case decided by the Supreme Court of Arkansas was a civil action and not a criminal prosecution. Notwithstanding the fact that the accident occurred in the heart of a town, the court states that the speed of the train alone would not be sufficient to establish liability if all other precautions were observed. We very much question that in the case at bar the circumstances are of such nature as to constitute criminal liability on the part of the engine driver. Not a single witness for the prosecution testified to having seen the locomotive before the accident occurred. Melitón Rivera spoke of a speed rather great and of fast running. Ramón Acevedo said that the train stopped at some distance ''from where he was struck.'' On examination by the defendant he stated that the train stopped rather far away, ''about from here to the farthest spectators.'' Pablo Rodríguez testified that the train was running too fast. Eugenio Iglesias stated that the engine stopped a good distance away. On examination by the defendant he stated that the crossing ''is, let us say, here and the engine struck and dragged the man in question about where you are and then the engine stopped about where those men yonder are.'' José La O Cordero testified that he heard the noise of the

train coming at full speed and that he saw the engine when it had already stopped. The above witnesses saw the accident but did not see the locomotive until the moment of the collision. Ramón Ortiz and Miguel Beltrán, witnesses for the defendant, testified that the engine stopped five or six meters from the crossing. Eduardo Pérez Rivera stated that the said engine stopped eight or ten meters from the place of the accident. Sebastián Mejías said that the engine came to a stop at a distance of eight meters. According to the evidence for the defendant the engine was traveling at a speed between fifteen and twenty kilometers per hour.

The decisions of the courts disagree as to the degree of negligence required for a conviction of involuntary manslaughter; but they all agree that a greater degree of negligence is required than that necessary to establish the right of a person to secure compensation for damages in a civil action. It is true that Section 328 of the Penal Code speaks of recklessness or carelessness; but it is clear that in using the latter word the code does not mean thereby a mere lack of care, but a degree of negligence or carelessness greater than that required to obtain compensation in a civil action.

In *People* v. *Adams,* 124 N.E. 575, 577, the Supreme Court of Illinois expressed itself as follows:

"The real question in the case is whether he was guilty of culpable or criminal negligence. That was a question of fact for the jury, and they should have been directed to pass upon that fact under instructions free from error or misleading statements as to the law. The fourth instruction for the people given by the court directs the jury, in substance, that every person who derives upon the public highway is under a legal duty to observe, in the control and management of his vehicle, the exercise of reasonable care to prevent injury to others. This is the law, but the instruction goes farther, and states that every person is criminally responsible for the neglect or willful failure to perform that duty. It is not the law that a person is criminally responsible for every act of mere negligence that causes the death of another. Negligence, to be criminal, must be gross or wanton negligence. Gross negligence is negligence that

borders on recklessness, and wanton negligence, as applied to the running of motors and vehicles, implies a positive disregard of the rules of diligence and a reckless heedlessness of consequences, according to Babbitt in his work on Motor Vehicles, section 1517. Ordinarily negligence merely denotes a negative quality in a person in attending or discharging a duty. Criminal liability cannot be predicated upon every lawful act carelessly performed, merely be-cause such carelessness results in the death of some one. Negligence, to become criminal, must necessarily be reckless or wanton and of such a character as shows an utter disregard of the safety of others under circumstances likely to cause injury. *People* v. *Falkovitch*, 280 Ill. 321, 117 N. E. 398, Ann. Cas. 1918 B, 1077.''

The above is the jurisprudence as generally established. To our mind the evidence introduced in the instant case, every circumstance being considered, is of such nature as to be insufficient to support a conviction. The evidence fails to show that the defendant has been criminally liable. The information charges failure in slowing down and we are of the opinion that, taking into account the place where the accident occurred and other circumstances surrounding the case, Santiago Rodríguez Rosario can not be held criminally liable for the offense with which he is charged.

The judgment appealed from must be reversed and the defendant discharged.