**The People of the State of Illinois, Plaintiff-Appellee, v. Larry Joe Post, Defendant-Appellant.**

**Gen. No. 65–50.**

Third District.

December 29, 1966.

Rehearing denied February 16, 1967.

James D. Reynolds, of Peoria, for appellant.

Bernard L. Oltman, State's Attorney, of Pekin, for appellee.

STOUDER, J.

This is an appeal by Defendant-Appellant, Larry Joe Post, from a judgment of conviction for involuntary manslaughter entered by the Circuit Court of Tazewell County pursuant to the verdict of a jury and for which Defendant was sentenced to a term of 5–10 years in the state penitentiary.

Defendant's version of the incident giving rise to this action, as presented by his voluntary statement admitted as evidence, and his testimony given at the trial, is that

on September 18, 1964, the Defendant resided at 816½ State Street, Pekin, Illinois. Defendant's house is located on the rear of the lot facing east toward North 9th Street directly behind the Hundt house which likewise faces on North 9th Street between State and Catherine Streets. An east-west alley runs along the south side of both the Hundt and Defendant's houses. On the night of September 18, 1964, Defendant and his wife were seated in their living room watching television. Defendant noticed that a car turned into the alley from North 9th Street, stopped, turned off its lights and then backed onto North 9th Street and parked. Shortly thereafter Defendant noticed a person walking along the alley "in a suspicious manner." Defendant became alarmed because prowlers and strange noises had been prevalent in the area. Defendant told his wife he was going outside to investigate, first securing from a bureau drawer a loaded 22 pistol. His wife indicated her desire to go along and they then went out of their front door. Seeing no one in the alley to the south they proceeded along the north side of their house to the rear area at which place Defendant's wife exclaimed that someone was on the fence. Defendant observed a person climbing on the fence leaning on the house near the bathroom window. He shouted for the person to stop and advanced toward him. The person climbed down from the fence, and ran around the corner of the house back into the alley and then ran east in the alley toward North 9th Street. Defendant then ran around the north side of his house running east toward his front yard. When he reached the front yard he ran to the fence along the south side of the property at the same time observing the person running east in the alley. He again shouted for the person to stop which command was disregarded and he continued to observe the intruder running east until his view was obscured by the Hundt house. Defendant testified that although he did not see

a person get into a car he heard a door slam, engine start and a car start north with a screeching of tires. Defendant ran back to the north side of the front yard hoping to see the car as it proceeded north. Defendant's view of the car was through the six-foot space between the Hundt house and the garage located on the next lot to the north. As the car sped north and while viewed by Defendant through the space between the Hundt house and garage, Defendant claimed that he discharged his pistol into the ground to scare the prowler away. After a few moments Defendant and his wife returned to the house, Defendant returning his pistol to the drawer. Defendant and his wife went to bed at 10:30.

Dennis Hundt, a boy 13 years of age who resides in the house directly in front of Defendant's house, testified that he was watching television at the time of the incident. He stated that his dog started barking on the porch, that he heard footsteps in the alley, that he saw no one in the alley but did see a car parked across the street. He resumed his television watching and several minutes later the dog again started barking and he saw a person running down the alley toward the car. As the person started to get into the car he heard a sharp noise which he thought could have been a shot being fired. The automobile started north on North 9th Street very fast with tires squealing. It went north past the first intersection for some distance and then went into reverse and came to rest at the intersection with its motor running. In cross-examination Defendant attempted to show that the noise which this witness heard might have been a noise other than a shot or might have occurred after the automobile had started north.

A passing motorist discovered Gary Nall, age 17, dead in his car at the intersection. Neither Defendant nor his wife knew Nall nor was any explanation of Nall's presence in the neighborhood offered.

At about 1 o'clock in the early morning hours of September 19 Pekin police officers called at the house of Defendant arousing him from bed. They asked him whether he had heard any unusual disturbances in the neighborhood, to which Defendant replied, "no." Inquiries were also made concerning any guns which the Defendant might have. Two rifles hanging on the wall were discussed, the Defendant commenting that they had not been fired for a long time. It does not appear that during this conversation the death of anyone in the neighborhood was revealed nor did Defendant reveal his possession of the pistol. Defendant explained his failure to mention his firing of the pistol because of his fear of being charged with the discharge of a weapon within the city. After the officers left the house Defendant removed the remaining shells from the pistol and transferred them to one of the rifles.

The police officers returned to the house the next morning after Defendant had gone to work and secured possession of the two rifles for investigation. It was discovered that one of these rifles contained five hollow-nosed 22 caliber shells. Later on the morning of September 19, after the coroner had removed the bullet which caused Nall's death finding it to be a hollow-nosed slug of small caliber, the investigating officers asked the Defendant to come to the police station for further questioning. At that time they advised Defendant that Gary Nall had been killed and that it was either an accident, manslaughter or murder. Defendant then stated that it was an accident, related the details of his conduct on the previous night and took the police officers to his house where he showed them the 22 caliber pistol. Thereafter Defendant signed a statement relating the details of the incident.

The bullet which was removed from Gary Nall's body was slightly flattened on the nose and one side. Ballistics

tests were inconclusive, there being insufficient microscopic markings to make test comparisons. At the trial a pathologist testified that the bullet so removed entered Nall's back, severed the aorta causing massive hemorrhaging into both cavities surrounding the lungs thereby causing death. The pathologist also testified that the trajectory of the bullet was more or less parallel to the ground and that the flattening of the bullet might have been caused by contact with bony structures in Nall's body. According to the witness, death occurred very shortly after the wound was inflicted probably within a period of five or ten minutes at most.

Defendant's wife testified, pursuant to a subpeona by the prosecution, corroborating Defendant's account of the circumstances leading up to the firing of the pistol. In her testimony she indicated that the discharge of the weapon occurred as the motor vehicle was proceeding north and while the car could be viewed through the six-foot space between the house and garage. Momentarily after the discharge she observed the gun in her husband's hand pointing in a downward direction. She also indicated that the night was dark but did not testify precisely as to the direction the weapon was pointing prior to or at the moment of discharge.

Defendant was indicted on three counts charging murder and two counts charging involuntary manslaughter. He was found guilty by the jury on one count of involuntary manslaughter and not guilty on all other counts.

Defendant relies on two assignments of error in seeking reversal of the judgment of the trial court. First, that the evidence is insufficient to sustain the conviction for involuntary manslaughter. Second, that the court erred in submitting the murder counts of the indictment to the jury along with the counts charging involuntary manslaughter, there being insufficient evidence to sustain the murder counts.

Defendant argues that the evidence is insufficient to support his conviction of involuntary manslaughter in that there is no evidence that Defendant shot deceased and that in any event Defendant's conduct constituted ordinary negligence only.

██ It is true the ballistics evidence relating the bullet removed from Nall's body to the pistol owned by Defendant is inconclusive. However the absence of technical ballistics evidence does not warrant the conclusion of Defendant that evidence is lacking that Defendant shot the deceased. From the testimony of persons involved in and having knowledge of the incident giving rise to this action the record discloses ample circumstances related in time and place from which the jury could have concluded that the Defendant shot the deceased.

In asserting that his conduct at most amounted to ordinary negligence Defendant argues that said conduct did not constitute involuntary manslaughter according to the principles announced in the decisions of the Supreme Court applicable prior to the adoption of the present statutory provisions in 1961. Chap 38, sec 9–3, Ill Rev Stats (1961) provides, "(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." Chap 38, sec 4–6, Ill Rev Stats (1961) provides, "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. . . ."

██ In the committee comments to chap 38, sec 9–3, Ill Rev Stats 1961, defining the crime of involuntary manslaughter, together with chap 38, sec 4–6, Ill Rev

Stats 1961, further defining the term "recklessly," it is indicated that it was the intention and purpose of the revision to include the principles of the crime of involuntary manslaughter as established in prior decisions. The term "recklessly," as so defined, was intended to describe the requisite mental state theretofore characterized in the decisions as "gross negligence," "wanton negligence" and the like. Decisions prior to 1961 are properly considered in the application of the present statutory provisions. Insofar as the decisions describe the requisite mental state, such decisions are important in their relation to the present definition of "recklessly," but they cannot be deemed to require a mental state different from that required in the present definition.

 The gist of the offense of involuntary manslaughter is the reckless performance of an act likely to cause death. Defendant argues that the discharge of a pistol into the ground in an effort to scare away an intruder is an act neither of a character likely to cause death nor is such an act performed recklessly. We find no support for Defendant's contention that the discharge of a pistol is an act not likely to cause death. On the contrary the deliberate and voluntary discharge of a pistol is by its nature inherently dangerous and the possible serious consequences to life and limb are apparent. In People v. Mulcahy, 318 Ill 332, 149 NE 266, an off duty police officer was convicted of involuntary manslaughter, the evidence tending to show that the accidental and unintentional discharge of the Defendant's pistol caused the death of his companion. Although the conviction in the Mulcahy case was reversed because of errors in instructions and in the introduction of evidence, the court held that the determination of the legal consequences of Defendant's conduct was properly within the province of the jury. In People v. Buzan, 351 Ill 610, 184 NE 890, it appears that a railway agent while on top of a moving

freight train was trying to drive off a crowd of trespassers. Buzan fired one shot into the air but his second shot caused the death of one of the trespassers. The court affirmed Defendant's conviction of involuntary manslaughter, the evidence being conflicting as to whether or not Defendant's pistol was discharged unintentionally as he fell to his knees on top of the moving train. In cases where there is a conflict in the evidence the jury has a right to conclude, as it obviously did in the Buzan case and in this case, that the discharge of the gun occurred in a manner other than that described by Defendant.

■ Likewise we find no support in the record for Defendant's contention that the evidence cannot and does not justify the jury's verdict that he acted recklessly. We have reviewed People v. Sikes, 328 Ill 64, 159 NE 293, People v. Adams, 289 Ill 339, 124 NE 575, People v. Falkovitch, 280 Ill 321, 117 NE 398 and People v. Hansen, 378 Ill 491, 38 NE2d 738, relied upon by Defendant. These cases are illustrative of the application of the general principles concerning involuntary manslaughter and are harmonious with the definition of "recklessly" in chap 38, sec 4–6, Ill Rev Stats (1961). Furthermore, in these cases the deaths were caused by the operation of motor vehicles and in none of these cases was the Defendant's act determined to be merely careless or merely negligent as a matter of law. Hence these cases do not directly support Defendant's contention that his conduct was merely careless or negligent and therefore not reckless.

Defendant in seeking to apply the principles of the foregoing cases insists it is uncontroverted that Defendant discharged his pistol into the ground in an effort to scare away an intruder. If we consider the conflicting inferences which can be drawn from the testimony of Virginia Post, wife of Defendant, the testimony of Hundt, the

testimony of the officers concerning the conduct of Defendant after the investigation had begun, and in particular the testimony of the pathologist to the effect that the bullet which caused Nall's death entered his body from the back travelling in a direction more or less parallel with the ground, it is clear that the Defendant's version of the incident is controverted by the evidence. We believe it is consistent with the evidence and the inferences which could have been drawn therefrom that the jury could have concluded that at the time Defendant discharged his pistol it was not aimed at the ground but was aimed in the general direction of or directly at deceased. The evidence, although conflicting, is sufficient to support the verdict of the jury and we do not find that such verdict is palpably erroneous.

Lastly we consider Defendant's contention that the trial court erred in denying his motions for directed verdict on the murder counts of the indictment and that the submission of such counts to the jury in the absence of evidence in support thereof constituted prejudicial error. In this connection it should be noted that it is not claimed that the jury was improperly instructed on any of the charges in the indictment. We are likewise not concerned with the propriety of the verdicts of the jury finding Defendant not guilty on the murder charges. On this subject the jury has spoken and its word is final.

■■ The proper purpose of a motion of Defendant for directed verdict is to present a question of law whether or not the evidence which has been presented is sufficient to sustain a conviction for the crime charged. People v. Chiafreddo, 381 Ill 214, 44 NE2d 888. The resolution of conflicting evidence or of different inferences which may be drawn from the evidence as well as the assessment of the credibility of the witnesses is the function of the jury. A verdict in favor of Defendant does not necessarily mean that insufficient evidence to

sustain a conviction had been presented but may mean that after viewing the conflicting evidence the jury adopted a view favorable to Defendant. The common-law distinctions between murder and manslaughter have always involved considerations of degree. People v. Davis, 35 Ill2d 55, 219 NE2d 468. What we have already said in large measure disposes of Defendant's present contention since its major premise is the assertion that evidence concerning the discharge of the pistol into the ground is uncontroverted. As we have said earlier in this opinion this assertion is inconsistent with other evidence including the physical evidence of the cause of death of deceased. In People v. Slaughter, 29 Ill2d 384, 194 NE2d 193, in the absence of eyewitnesses, the court sustained a conviction of murder although Defendant claimed the discharge of his shotgun was accidental and unintentional. The court concluding that the mental state with which the act is committed can be inferred from the act itself. In view of the conflicting evidence no error was committed by the trial court in submitting all issues to the jury.

Finding no error in the judgment of the Circuit Court of Tazewell County judgment is affirmed.

Judgment affirmed.

CORYN, P. J. and ALLOY, J., concur.