(No. 38229.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BETTY JEAN DAVIS, Plaintiff in Error.

*Opinion filed May 23, 1966.—Rehearing denied September 21, 1966.*

JAMES J. McGRAW and JEROME J. JACOBSON, both of Chicago, appointed by the court, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED

G. LEACH, Assistant Attorney General, and ELMER C. KIS-
SANE and ALBERT J. ARMONDA, Assistant State's Attorneys,
of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the
court:

A jury in the criminal court of Cook County found the
defendant, Betty Jean Davis, guilty of the murder of Leroy
Hill, and she was sentenced to the women's reformatory for
a term of not less than fifteen nor more than twenty-five
years. She has appealed contending: (1) that the statute
under which she was charged is so vague and uncertain as
to offend constitutional requirements of due process; (2)
that an instruction to the jury, in the language of the statute
confused the offenses of murder and manslaughter; (3) that
under the evidence the jury should have found either that
the killing was in self-defense or that it was manslaughter;
and (4) that certain errors deprived her of a fair and im-
partial trial.

The defendant and Leroy Hill had at one time cohabited
as man and wife, and Hill was the father of the defendant's
youngest child. At about 10:45 on the night of March 23,
1962, police officers summoned to defendant's apartment
found Hill lying on the kitchen floor. He had a bullet
wound in his neck, which caused his death. The defendant
and her uncle, Frank McDowell, were the only persons
present. The defendant told the officers that Hill was her
ex-boy friend, and that when she refused to admit him to
the apartment he had broken a window pane, reached in
and unlatched the door and entered in a "threatening man-
ner." She ran to the pantry, got a gun, and shot him after
he had paid no heed to her warning to get out. Subsequent
investigation disclosed that Jesse Fason and his wife, Ethel
Fason, had been present at the time of the shooting. When
confronted with their statements of what had occurred, the
defendant admitted that after the shooting the window pane

had been broken and the deceased's coat had been placed upon his body to give the appearance of a forced entry. She testified at the trial, however, that these things had been done by McDowell or Fason because Ethel Fason stated that she did not want to become involved in a killing.

It is not disputed that defendant, McDowell, the Fasons and Leroy Hill were present in the apartment on the evening in question. Food was prepared and after they had eaten, some of those present began to drink. There was no showing that anyone was intoxicated. All but Jesse Fason began to play cards.

Ethel Fason testified that shortly after the card game started, she and the defendant went to the bathroom and the defendant there told her that a week earlier Hill had accused her of sleeping with her uncle, and that if decedent "started anything tonight" the uncle was going to kill him. Ethel Fason also testified that the defendant showed the witness two guns in a pasteboard box on the pantry shelf and stated: "Now, don't you think we are ready if he starts something?" The defendant admitted showing the guns to the witness, and that they had been in the bathroom together, but she denied the statements attributed to her. She testified rather that she had shown the guns to Ethel Fason before the men arrived in the apartment, and that her only statement in the bathroom had been to the effect that the bickering in the card game was making her nervous.

The card game continued after the women returned to the table and the shooting occurred shortly thereafter. According to Fason and his wife, the defendant stated that she had no money and asked Hill for $2. When he refused, the defendant went to the pantry and returned with a gun which she brandished angrily while continuing her demands for $2. At this point Ethel Fason ran out of the apartment and, as she did so, she heard her husband asking defendant to put up the gun, and then the sound of two shots. Jesse

Fason testified that decedent just sat still with his hands on the table and said nothing when confronted with the gun. Fason also testified that he pleaded with the defendant to put down the gun, and that she would not do so. He asked her if he could leave and was told that he could. He stated that before he could reach the door defendant fired two shots, after which Hill fell to the floor, knocking over the table as he fell. As he was going out the door, Fason heard the decedent say: "Well, looks like you did get me," to which the defendant profanely replied that all she had wanted was her $2.

The constitutional argument advanced by the defendant is somewhat difficult to follow. As we understand it, however, it centers upon the definitions of the crimes of murder and voluntary and involuntary manslaughter as they appear in the Criminal Code. The relevant portions of these definitions are:

"§ 9—1. Murder.] (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; * * *.

"§ 9—2. Voluntary Manslaughter.] (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing * * * but his belief is unreasonable.

"§ 9—3. Involuntary Manslaughter and Reckless Homicide.] (a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." Ill. Rev. Stat. 1961, chap. 38, pars. 9—1, 9—2, 9—3.

The instructions tendered by the defendant with respect to self-defense and the offenses of voluntary and involuntary manslaughter were given. The single instruction tendered and given on behalf of the prosecution was as follows: "The Court instructs the jury, in the language of the statute, that a person who kills an individual without lawful justification, commits murder, if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another." This instruction omits any reference to section 9—1(a)(1), which relates to the performance of the act which caused death with intent to kill or do great bodily harm, or with knowledge that the act would cause death.

The defendant's contention appears to be that in order to find the defendant guilty of murder, the jury "should have been instructed that they must find that the defendant had the intention to engage in conduct the result of which would be the death or great bodily harm to someone." And since the murder instruction given on behalf of the People omitted any reference to intent, it is argued that "element for element, the instruction pertaining to murder contained only elements in common with manslaughter and

contained no differentiating intention element." It is there-
fore argued that the jury was confused, and failed to dis-
tinguish between the two offenses. It is apparently for these
reasons that the defendant contends that "the statute as
applied in this case violates the due process clauses of the
state and federal constitutions."

The statutory definitions of murder and manslaughter,
set forth above, represent a conscious effort on the part of
the draftsmen of the Criminal Code of 1961 to express the
requirements of the common-law crimes in simple language.
Particularly, the draftsmen sought to avoid any reference
to the common-law concept of "malice aforethought." This
common-law concept, including both "express" and "im-
plied" malice, had been applied by this court in a host of
decisions. From these decisions, from statutes in other states
and from the works of legal scholars the drafting com-
mittee evolved the definitions which appear in the Code.

The common-law distinctions between murder and man-
slaughter have always involved considerations of degree,
(see, *Morissette* v. *United States,* 342 U.S. 246, 251, foot-
note 8,) and similar considerations appear in the Code
definitions. In its comments to section 9—1(a)(2) the
drafting committee said: "Clearly, no sharp dividing lines
can be drawn, but the Committee chose 'strong probability'
as the plainest description of the situation which lies be-
tween the 'practical certainty' of the preceding subsection,
and the 'likely cause' and 'substantial and unjustifiable risk'
of the involuntary manslaughter provision (§ 9—3, using
'recklessly' as defined in § 4—6). This phrase would seem
to require a minimum of further definition in jury instruc-
tions, and to permit ready comparison with the other two
situations mentioned, when the evidence requires instruc-
tions thereon." S.H.A., chap. 38, par. 9—1, Committee
Comments.

The evidence in this case would have justified an instruc-
tion based upon the theory that the defendant deliberately

intended to kill Leroy Hill. The record does not indicate why the prosecution failed to submit such an instruction. It is difficult, however, to see how its failure to do so could have operated to the disadvantage of the defendant. The murder instruction that was given expressed a familiar aspect of implied malice. To justify a conviction of murder, it has not been necessary that the accused should have deliberately formed an intent to kill; it has been sufficient to show that he voluntarily and wilfully committed an act, the direct and natural tendency of which was to destroy another's life. (*People* v. *Marrow,* 403 Ill. 69; *People* v. *Johnson,* 2 Ill.2d 165.) The intent is implied from the character of the act. *People* v. *Winters,* 29 Ill.2d 74.

Where, as here, the evidence is conflicting, it is for the jury to decide under proper instructions whether a homicide was murder or manslaughter, or whether it was justified as self-defense. As we have stated, there was sufficient proof, if believed by the jurors, to justify a conviction of murder. In our opinion, neither the statute nor the instructions violated the constitutional rights of the defendant.

The defendant asserts that prejudicial error occurred when an assistant State's Attorney argued to the jury: "We all heard her in and out of each other's beds like jacks in a box. They have as much regard for the state (sic) or holy sacrament of marriage as the man in the moon. The thing never enters their mind. That is their life." In this case the defendant admitted having illicit relations with Hill until 1961; Hill's brother testified that these relations continued during 1962. The defendant testified that she had terminated her relationship with Hill because of his molestation of one of her daughters, and the jury was informed that the uncle, Frank McDowell, was not present for the trial because he was confined in a penitentiary for the crime of statutory rape. The remarks in question should not have been made, but we can not say, upon this record, that they are sufficiently prejudicial to warrant reversal.

The defendant's contention that the trial judge exhibited hostility toward her attorney which prejudiced her cause in the eyes of the jury is based upon the judge's admonitions not to "stand in front of the witness," and to "step back from the witness." We do not believe that these directions could have been interpreted by the jury as manifestations of hostility.

Finally, it is claimed that the trial court unduly restricted defendant's cross-examination of Ethel Fason. Here, however, it appears that the trial court sustained objections to excessive and pointless repetition. Where a witness has already testified fully as to the facts involved, it is not improper for the court to restrict repetitious interrogation. *People* v. *McCain,* 29 Ill.2d 132.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*