THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JEROME F. JOHNSON, Defendant-Appellant.

(No. 11576;

Fourth District—November 6, 1975.

Richard J. Wilson and Thomas Nelson, both of State Appellate Defender's Office, and Michael Costello, all of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (G. Michael Prall, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMKINS delivered the opinion of the court:

Defendant was tried and convicted of murder in a bench trial in January 1971. Defendant appealed from that judgment and from a sentence of 20-30 years. In *People v. Johnson*, 11 Ill.App.3d 395, 296 N.E.2d 763, this court remanded for an evidentiary hearing on sanity, not deciding the other issues presented by the appeal, pending the outcome of the hearing. The hearing was held in July, 1974. Defendant was

found to be sane at the time of the offense. Defendant raises an additional contention based on the finding of sanity and again presses the issues which were left undecided by the earlier opinion. We affirm the judgment and sentence.

Defendant raises four issues: (1) Whether he was proved sane beyond a reasonable doubt; (2) Whether the statements obtained from him and the evidence uncovered as a result should have been suppressed; (3) Whether the offense should be reduced from murder to involuntary manslaughter; and (4) Whether the sentence of 20 to 30 years is excessive.

## ISSUE NO. 1

At the hearing on defendant's sanity at the time of the offense, extensive testimony was offered. All of the expert witnesses basically considered the same information, as it was supplied by defendant, members of his family, or the reports of other doctors. The information briefly was as follows: At the time of the offense defendant was a single, male, homosexual. He had graduated from high school and was attending Illinois State University. According to standard objective tests, he was of average intelligence and did not have any brain damage or impairment.

Defendant was brought up by a relative of his natural mother and reacted badly when informed that the woman he thought of as his mother was not his mother in fact. At an age of five or six, defendant occasionally was tied up to trees, "hypnotized" by older children, who also played with him sexually. The children also engaged in a smothering ritual whereby pillows were used to induce unconsciousness.

When Jerome was seven or eight years old he hit another child with a hammer. As a result his mother brought him in for diagnosis at the Mental Health Center. She was told he would become a homosexual. He was a very nervous boy, but good.

At college defendant was hospitalized for psychiatric evaluation after an incident, in which defendant, apparently sleeping, attempted to stab his roommate.

Defendant's statement about the offense admitted that Thomas Porter, the decedent, a boy of 13 or 14, was invited to Johnson's house. With Porter's permission, defendant tied up his hands and feet and attempted to "hypnotize" him. After this defendant placed a pillow over Porter's face. The child was struggling at that point. In accordance with his practice, defendant then attempted to revive the boy but could not. He hid the dead boy and his bicycle in the basement of the house in which he was living.

Various boys testified about incidents involving defendant between the summer of 1968 and the date of Porter's death. The boys were about

10 to 13 at the time of the incidents. All involved tying of arms and legs, "hypnotizing" and frequently smothering with a pillow. The boys apparently were not sexually assaulted. Defendant's repeated explanation was that he just wanted to take care of the boys, to wash and feed them.

For the defense, Dr. Hicks, a psychiatrist, testified by deposition, that defendant was suffering from chronic, undifferentiated schizophrenia and stated, in the usual, ritualistic legal words, that defendant, at the time of the offense, because of mental disease, was incapable of conforming his conduct to the requirements of law and incapable of deciding the rectitude of his acts. Dr. Hicks read the diagnosis of Dr. Baumann, deceased at the time of trial. Dr. Baumann also thought defendant schizophrenic, with paranoid tendencies, but this was a different type of schizophrenia from Dr. Hicks' diagnosis. Dr. Baumann also considered defendant to be legally insane. Mr. Imhoff, a psychologist, found defendant to have significant mental disorders, but defendant's profile was unlike the usual criminal profile. He thought defendant would profit from treatment. Dr. Bornstein, who examined defendant in 1974, found defendant was a sexual deviate, suffering from transsexualism and did not have control over his smothering rituals, which were compulsive. Dr. Bornstein testified in the usual language; he thought defendant was insane. Defendant, he said, lacked free will, was not aware of how dangerous the ritual was, and did not intend to harm anyone.

Dr. Chapman, a psychiatrist, testified for the State that defendant had a passive-aggressive personality disorder but no gross psychiatric illness. Defendant, he said, was not psychotic, knew right from wrong and could refrain from wrong. Dr. Ludin, who had testified at the time of the original trial, believed defendant was a schizoid personality with neurotic compulsive obsessive tendencies in the area of sex. Dr. Ludin did not feel defendant was psychotic, felt defendant understood his conduct and could conform to the law.

■■ Once the defense of insanity has been raised, the State has the burden of proving sanity beyond a reasonable doubt. (*People v. Hawkins*, 53 Ill.2d 181, 290 N.E.2d 231.) Whether defendant was insane is a question of fact for the trier of fact. (*People v. Ford*, 39 Ill.2d 318, 235 N.E. 2d 576.) Two psychiatrists testified defendant was sane. The trial court heard the evidence and found that defendant was sane. When evidence is conflicting we do not, on review, substitute our opinion on the weight of the evidence for that of the trier of fact.

*ISSUE NO. 2*

The defense argues that the first statement obtained from defendant was obtained in violation of the dictates of *Miranda v. Arizona*, 384 U.S.

436, 16 L.Ed.2d 694, 86 S.Ct. 1602. They argue that this, and the other evidence which was a "fruit" of this statement should not have been allowed in.

The statement in question was obtained from defendant on July 3, 1970. A police officer testified at trial that, on that date, he and another officer took defendant from Springfield to Peoria for a lie detector test which defendant agreed to undergo. The officer gave defendant the *Miranda* warnings before the trip. In Peoria, defendant twice refused to take the test although the officer urged him to do so. The officers began questioning and defendant admitted that the boy was dead. A short time later defendant said he had killed the boy with his hands. Other incriminating statements followed.

■■ It is well settled that defendant cannot raise the question of the voluntariness of his confession for the first time on appeal. (*People v. Routt*, 100 Ill.App.2d 388, 241 N.E.2d 206.) As in *Routt*, defendant here made no objection to the testimony of the officers who related the statements; made no motion to suppress; did not request a hearing on admissibility at trial; and made no mention of this issue in his post-trial motion. The failure to preserve the issue for review is a waiver of that issue. Nor do we believe that the circumstances here were such as to require us to hold that plain error was committed by admitting the testimony. Defendant's refusal to take the lie detector tests cannot be considered such an assertion of his rights previously given him as to require the officers to cease questioning him. See *People v. Starnes*, 8 Ill.App.3d 709, 289 N.E.2d 264, where the court held that a refusal to sign a waiver of rights form did not automatically mean that a subsequent confession was involuntary.

## ISSUE NO. 3

The most troublesome issue presented by this appeal is the argument that the evidence does not establish the offense of murder but of involuntary manslaughter.

The offense of murder is defined, in pertinent part, as:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) * * *

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; * * *." (Ill. Rev. Stat. 1969, ch. 38, § 9—1.)

Involuntary manslaughter is defined:

"(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." Ill. Rev. Stat. 1969, ch. 38, § 9—3.

In *People v. Davis*, 35 Ill.2d 55, 60, 219 N.E.2d 468, 471, the court said:

"The common-law distinctions between murder and manslaughter have always involved considerations of degree, [citation] and similar considerations appear in the Code definitions. In its comments to section 9—1(a)(2) the drafting committee said: 'Clearly, no sharp dividing lines can be drawn, but the committee chose "strong probability" as the plainest description of the situation which lies between the "practical certainty" of the preceding subsection, [9—1(a)(1)] and the "likely cause" and "substantial and unjustifiable risk" of the involuntary manslaughter provision (§ 9—3, using "recklessly" as defined in § 4—6). This phrase would seem to require a minimum of further definition in jury instructions, and to permit ready comparison with the other two situations mentioned, when the evidence requires instruction thereon.' S.H.A., chap. 38, par. 9—1, Committee Comments."

It can be seen, therefore, that the distinction between murder and involuntary manslaughter rests in the degree to which the acts which defendant performed risk death or great bodily harm.

Although defendant argues there was no "strong probability" here, that is clearly incorrect. The pathologist testified that unconsciousness would result when the air supply is cut off for 30 to 60 seconds. Death would result in 45 to 120 seconds. That mere seconds separate the unconsciousness defendant admittedly wished to produce, and death, make the risk of death or great bodily harm more than a "likely" chance.

Counsel argues that defendant did not "intend" death. Intent to cause death is not required by the second subsection of the murder provision. Knowledge of the risk is required. To hold that defendant, a 20-year-old college student, had no knowledge that smothering could cause death as well as unconsciousness, would be to hold defendant innocent of involuntary manslaughter as well as murder. One of the elements of involuntary manslaughter is that the acts be performed recklessly. Recklessly is defined, partially, as a *"conscious"* disregard of a substantial and unjustifiable risk. If defendant was unaware of the risk involved, he could not be guilty of involuntary manslaughter.

*People v. Guthrie*, 123 Ill.App.2d 407, 258 N.E.2d 802, discusses this issue under analogous circumstances. In *Guthrie*, defendant was con-

victed of murder. Death occurred after defendant tied the decedent and left him in a cornfield. Defendant said that he tied decedent with decedent's consent in order to carry out a plan to defraud an insurance company by making it appear decedent's car had been stolen. This court said:

> "From the circumstance in this record, a jury might well believe beyond a reasonable doubt that Goodin was dead before Guthrie left the cornfield or that Guthrie knew or should have known that typing him in this fashion at that place under such circumstances created a strong probability of death or great bodily harm to that individual. No matter what explanation is given for tying Goodin in the cornfield, the cold, blunt fact remains that as done, there was a strong probability of death or great bodily harm from such acts and that he died while so tied. We have no difficulty in believing that reasonable minds could well agree on this point." 123 Ill.App.2d 407, 412, 258 N.E.2d 802, 804-5.

This court reversed in *Guthrie* because the evidence could support involuntary manslaughter as well but the jury was not given such instructions. No such problem is present here as the trial was a bench trial.

■■ Whether the particular acts of the defendant create a "strong probability" of death or great bodily harm or whether they are "likely" to cause death or great bodily harm is a question of fact to be decided under all the circumstances as presented to the trier of fact. Here the trial judge found defendant guilty of murder that defendant, by placing a pillow over the Porter boy's face, created a "strong probability" of death. That finding is not against the manifest weight of the evidence.

■■ The defense argues that the psychiatric testimony should be recognized, at least, as sufficient to reduce the degree of the offense. They cite for this proposition an article in 34 Cal. L. Rev. at 625, Taylor, *Partial Insanity as Affecting the Degree of Crime—A Commentary on Fisher v. United States* (1946). The English Homicide Act of 1957 provides for the reduction of a charge from murder to manslaughter if defendant establishes that he suffers from such an abnormality of mind as to substantially impair his mental responsibility, but defendant has not cited any jurisdiction which has accepted this proposition. Such a concept is not without substantial difficulties. (See Dix, *Psychological Abnormality as a Factor in Grading Criminal Liability: Diminished Capacity, Diminished Responsibility, and the Like*, 62 J. Crim. L., Criminology & Police Science, 313 (1971).) If such a principle, which would have enormous impact on our concept of legal responsibility, is to be established it must be done by the legislature.

*ISSUE NO. 4*

Defendant argues that his sentence of 20 to 30 years is excessive and should be reduced.

■■ Supreme Court Rule 615(b) (Ill. Rev. Stat. 1973, ch. 110A, § 615 (b)) gives the court power to reduce sentences. It is well established that this power should be used with great discretion. (*People v. Nelson*, 41 Ill.2d 364, 243 N.E.2d 225.) An extensive hearing in aggravation and mitigation was held and all relevant information was presented to the trial court. Defendant had a prior conviction arising out of the incident in which he stabbed his roommate. There was evidence that defendant had threatened another child after one of the smothering rituals. Defendant presented evidence of good habits and character. This was considered by the trial judge, and we do not consider the sentence so harsh as to be excessive.

Accordingly, for the reasons stated above the judgment of the circuit court of Sangamon County is affirmed.

Judgment affirmed.

TRAPP and CRAVEN, JJ., concur.