THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WALTER MICHAEL PALMER, Defendant-Appellant.

Fifth District　No. 78-94

Opinion filed September 28, 1979.

KASSERMAN, J., dissenting.

Richard J. Wilson and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

William B. Ballard, Jr., State's Attorney, of Jonesboro (Raymond F. Buckley, Jr., and Martin N. Ashley, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KUNCE delivered the opinion of the court:

After a jury trial in the Circuit Court of Union County, the defendant was convicted of murder and three counts of aggravated battery. He was sentenced to concurrent terms of 100 to 150 years imprisonment for murder and 3 1/3 to 10 years for each aggravated battery. The victim of

the offenses was Jason Bruce, the 22-month-old son of Catherine Bruce, who resided with the defendant at his trailer home in rural Anna.

On appeal, the defendant alleges numerous errors: that the prosecution failed to prove that the defendant inflicted the fatal injuries on the child; that the evidence as to the defendant's mental state was insufficient to support a murder conviction; that certain testimony presented in rebuttal was erroneously admitted; that the court improperly entered judgments of conviction on the aggravated battery counts; and that the court abused its discretion in imposing a sentence of 100 to 150 years imprisonment for the offense of murder. Our resolution of these issues requires that we summarize the evidence at some length.

Linda Reynolds was the registered nurse in charge of the emergency room at Union County Hospital on the morning of July 16, 1977. She testified that she received a telephone call at 9:15 that morning, alerting her that a sick baby was about to be brought to the hospital. About 9:40 a.m., Jason Bruce was brought in to the emergency room by the defendant, Walter Palmer. The child was not breathing and had a very faint pulse. His head, torso, legs, back, and buttocks were covered with bruises, and there were bite marks on his leg and arm. The defendant told Nurse Reynolds that the baby had choked on a ham and cheese sandwich. Emergency room personnel began cardiopulmonary resuscitation procedures and worked to revive the child for about 50 minutes. Nurse Reynolds stuck her finger in the child's mouth and determined that his airway was clear. One speck of bread was removed from the child's mouth and another crumb was found on a tube inserted into the child's trachea. The bread had not blocked the passage of air. The child was pronounced dead at 10:30 a.m.

Catherine Robinson, another registered nurse who was on duty at the hospital, administered mouth-to-mouth resuscitation during the attempts to revive the child. She also testified that there was no obstruction of the child's air passageway, and that no food particles were removed from the airway.

Edna Havilland, a licensed practical nurse, also took part in the attempts to revive the child. Her testimony as to the absence of any obstruction in the air passageway was consistent with that of the other two nurses. Nurse Havilland talked to the defendant after he brought the child in. He told her that he had been feeding the child a ham and cheese sandwich, had left the room, and had returned to find the child choking. He told her that when he tried to give the child a drink of water, he noticed that he was not breathing very well, so he brought him to the hospital. The defendant explained the bite marks on the child's body by telling Nurse Havilland that he had bitten the child in an attempt to break him of his habit of biting people. Nurse Havilland also talked to the child's mother, Catherine Bruce, who told the nurse that she had been at

work earlier that morning and did not know what had happened to the child. Mrs. Bruce explained the bruises on the child's body by stating that he had fallen numerous times during the previous two weeks.

Dr. Carroll Loomis was called to the emergency room to treat the child. There were no signs of life when he arrived. Dr. Loomis described the bruises on the child's body and identified photographs as accurately depicting the child's appearance on July 16. Dr. Loomis expressed the opinion that the extensive bruises all over the body of the child could not have been caused by falls. He identified the following entry on the emergency room report as made by him, based in part on what he was told on his arrival by other hospital personnel:

> "When first seen the nurses were doing mouth-to-mouth and the airway was open with breath sounds. There was never any signs of life. * * * A large wad of bread was removed from the back of the mouth which may have been the cause of airway obstruction initially and was probably dislodged with the Heimlich maneuver on arrival."

Dr. Jerry Goddard arrived at the emergency room about 9:50 a.m. He placed an intravenous line into a vein in the child's neck in an attempt to insert medication which would aid in resuscitation. He pronounced the child dead at 10:30 a.m. He testified that in his opinion falls could not have caused the number of bruises and the pattern of bruises found on the child's body.

Catherine Bruce, the child's mother, testified that she and her son moved from Marion to the defendant's residence in Anna on June 29, about 2½ weeks prior to the child's death. They lived with the defendant in a trailer near the defendant's mother's house. Mrs. Bruce obtained employment and began to work on July 5. The defendant or his mother would take care of Jason while Mrs. Bruce worked. According to Mrs. Bruce, although Jason did bruise easily because of his fair complexion, he had not had extensive bruises before they moved in with the defendant. She began to notice bruises on Jason after she began leaving him with the defendant or the defendant's mother. They would explain to her that the child had fallen. She recalled seeing the child fall on two occasions. She thought his falling was normal for a child his age. She was never told that Jason had fallen down the basement stairs at the defendant's mother's house.

On the Thursday night before the child's death on Saturday, Mrs. Bruce was in the room with the defendant when he whipped Jason. She heard a "thud" which she thought was Jason hitting the wall. She asked the defendant not to spank Jason so hard. The defendant told her that the bed had bounced against the wall.

About 5:30 p.m. on the day before Jason's death, Mrs. Bruce went to

the store with the defendant's mother, while the defendant stayed to babysit with Jason. When Mrs. Bruce returned about an hour later, she found Jason lying between the bed and the wall. The defendant told her that Jason had gotten himself caught there. The defendant did not at first want Mrs. Bruce to extricate the child. When she did so, she found that he had a mark under his right eye and a "busted upper lip." The defendant refused to explain to her what had happened to Jason. Jason had appeared to his mother to have had difficulties in hearing for two or three days before his death. On Thursday and Friday, he would ignore her when she talked to him.

Mrs. Bruce had told the nurse at the emergency room that Jason's bruises had been caused by falling. She testified that her reason for saying that was that she had herself been given that explanation. She had been shocked by the extent of the bruises she saw on Jason's body on the morning of his death.

Mrs. Bruce testified that she did not place any bruises on the child. She had not been suspicious about the explanations given her for the bruises because the defendant had always been good to Jason when she was around. She had planned to move away from the defendant because she felt that he did not really want her or Jason with him. She felt guilty because she thought that she should have known that the child was being mistreated.

The next witness for the prosecution was Dr. Alden Thompson, a forensic pathologist, who performed an autopsy on the afternoon of the child's death. He found the stomach and intestines empty, indicating that the child had not eaten for many hours prior to his death. The body was covered with subcutaneous hemorrhages. The doctor observed four pairs of bite marks on the upper left arm, which had caused hemorrhages, but had not punctured the skin. There were several large hemorrhages on the cheek and scalp, one on the left arm, several on the chest, and approximately 30 in the soft tissue of the abdomen. One very large subcutaneous hemorrhage extended from the lower back, over the buttocks, and to the thighs. Large diffused hemorrhages appeared at the front and vertex of the scalp. A large subdural hematoma (blood clot), approximately three-eighths of an inch thick, covered virtually the entire surface of the brain.

Some of the multiple injuries to the abdomen had caused hemorrhages in the small intestine. The abdominal bruises were about 3 inches deep. Dr. Thompson testified that it takes "quite a sharp blow to cause that type of hemorrhage." The injuries were caused by poking or thrusting with an object such as a pencil, stick, or finger. They were "too multiple and too diffuse to have been caused by bumping into something" or by falling, according to Dr. Thompson. The subdural hematoma

covering the brain was caused by at least a dozen distinct hard blows with a large blunt object to the top of the child's head.

The pathologist testified that it was difficult to state precisely when the various injuries had occurred. He estimated that the injuries to the abdomen were two days old, that the injuries to the buttocks were at least one day old, and that some of the injuries to the head were at least a day old, while others were 12 to 24 hours old.

The cause of the child's death, according to the pathologist, was cerebral edema, or excessive buildup of fluid in the brain. The cerebral edema resulted from the subdural hematoma brought on by the multiple head injuries. The child did not die of choking, and his injuries were not the result of falling. The doctor explained that the conditions which he found took place over a period of time while the fluid accumulated in the brain. Eventually respiratory cardiac paralysis resulted. A person suffering from conditions such as the doctor described would become unconscious some hours before his death. It would not be possible for him to eat in that state.

Dr. Renato Katubig, a pediatrician in Marion who had treated Jason Bruce, testified that he had advised Mrs. Bruce of the possibility that Jason might suffer from a congenital hip dislocation. He had referred the child to a crippled children's hospital for flat feet and an outside rotation of the foot, but the hospital did not recommend treatment. The hip condition was not evident as the child grew older. His records showed no evidence that the child had any problem with abnormal bruising. Dr. Katubig last saw Jason on June 10, 1977, about five weeks before his death.

The defendant's mother, Florine Palmer, was the first witness on her son's behalf. She testified that she had taken care of Jason Bruce almost every other day from July 5, when Mrs. Bruce began to work, until July 16, the date of the child's death. He appeared to her to have balance and hearing problems. She saw him fall on numerous occasions. On the Tuesday or Wednesday before his death, he fell down Mrs. Palmer's basement stairs and hit the cement floor, according to her testimony. She did not take him to the hospital after that fall. She testified that she never saw her son whip, beat, or hit the child. Nor, she testified, did she ever beat the child. According to Mrs. Palmer, Catherine Bruce did not show much interest in or affection toward the child.

Between 7:30 and 8 a.m. on Saturday morning, July 16, the defendant brought the child to Mrs. Palmer's house and asked her if she knew what was wrong with him. He told her that the child had been eating and had become ill. The child was having difficulty breathing; Mrs. Palmer thought that he was dying. She called the emergency room at the hospital and immediately left for the hospital with the defendant and the child,

leaving the telephone off the hook in her haste. Strange sounds were coming from the child's throat en route to the hospital. The defendant stuck his fingers into the child's throat and pulled out two small pieces of bread.

The defendant's father, brother, sister, and sister-in-law all testified that they had seen the baby fall many times, and that he appeared to be hard of hearing. Ricky Palmer, the defendant's brother, testified that he had seen the child on the Wednesday before he died, and at that time the child had bruises on his face and back. He never saw the defendant spank Jason very hard. He testified that Mrs. Bruce didn't seem to worry about the child's falling. Joyce Palmer, the defendant's sister-in-law, testified that she had seen the child the day before he died. He had bruises on his back, forehead, arms, and legs. When she told the child's mother that she should take Jason to the doctor, Mrs. Bruce "just laughed, it didn't seem like it bothered her at all." According to Mrs. Nancy Optande, the defendant's sister, Catherine Bruce never went to Jason's aid when he fell. Mrs. Optande did not believe that Catherine Bruce really cared about Jason. She never saw the defendant beat Jason.

Deputy Sheriff Jim Nash testified that he went to the defendant's trailer about 2 or 2:30 on the afternoon of the child's death. The temperature in the trailer was close to 100 degrees. He found some bread and ham and cheese loaf on the baby's high chair in the kitchen, and some bread on the floor. He also found three small pieces of bread about the size of a little fingernail on the floorboard of the passenger side of Mrs. Palmer's truck, which had transported the child and the defendant to the hospital. The small pieces of bread looked as if they had been wet and then dried up.

The defendant took the stand on his own behalf. He also testified as to Jason's propensity to fall and bruise himself and his apparent difficulty in hearing. He testified that he had bit the child about nine times, in an attempt to cure him from the habit of biting other people. He would spank Jason when he did such things as approach too near electrical outlets, eat feces, or refuse to eat his food. The defendant testified that he did not hit the child hard, and that he never struck the child with his fist, hit the child on the head, knocked or threw the child down, nor intentionally hurt the child.

The defendant had developed an ear infection on Tuesday, July 12. He was taking codeine for the pain. About 8 p.m. on Thursday, July 14, he had spanked the child "hard enough to feel it" because he was playing behind the bed near an electrical outlet. The child's head did not hit the wall.

On Friday, July 15, Mrs. Palmer kept the child during the day, and Mrs. Bruce was home in the evening. The defendant testified that on

Saturday morning, the day of the child's death, he again spanked Jason for going behind the bed. The child then played by himself in another room for about 45 minutes. The defendant heard the child fall a couple of times. It was extremely hot in the trailer, and the only air conditioner was in the bedroom. The defendant gave the child a bath to cool him off, then made him a sandwich and placed him in his high chair. The defendant left the room to get some medicine for himself, and when he returned he noticed that the child was choking and coughing. He gave the child a drink of milk and the choking ceased. He then took Jason to the bedroom for a nap. After he noticed that the child was staring "glassy eyed," the defendant realized that something was wrong and took the child to his mother's house.

The defendant testified that Mrs. Palmer had driven as rapidly as possible straight to the hospital. On the way, he attempted mouth-to-mouth resuscitation and removed some bread from the child's mouth. He did not remember being told about the child's fall down the basement steps at his mother's house. He was unable to explain the source of the bruises on the child's face. He had spanked the child three or four times in the last three days of the child's life. He had seen Mrs. Bruce spank the child several times. He was unable to explain how the child received his injuries, nor why it had taken 25 minutes to travel the 2½ to three miles between his mother's house and the hospital.

Finally, three people who had known the defendant for periods ranging from 2½ years to 10 years testified that he had a good reputation in the community as a peaceful and law-abiding citizen.

The State called five witnesses in rebuttal. Yvonne Allbright, a social worker for the Department of Children and Family Services, testified that she had known the defendant for 14 months, and he had a bad reputation in the community. Sheriff Larry Tripp, who had known the defendant for seven or eight months, also testified that he had a bad reputation.

Naomi Boles, who had been Mrs. Bruce's landlady in Marion, testified that she had seen Catherine and Jason Bruce frequently when they lived in Marion, that Mrs. Bruce took good care of Jason, that he appeared to be a normal child, and that she had never noticed any unusual bruising on him or that he fell more often than a normal child of his age.

Alice Perry testified that she had known Catherine Bruce and Jason when they lived in Marion. They had appeared to her to have a good mother-child relationship. She had never seen Jason fall nor observed any bruises on him. Over objection, Mrs. Perry was permitted to testify to the substance of a conversation between Catherine Bruce and Florine Palmer which she had overheard. The witness testified that the defendant's mother had said that "she did all she could for Jason, that she put him on

the freezer and packed him with ice," and that "she didn't know what got into Wally, because he was always so good to his little pigs," and that "she didn't know why he done it."

Grace Johns testified that she had received a telephone call from Florine Palmer a little more than an hour after the child died. Over objection, Mrs. Johns testified that Florine Palmer had told her that she had been in the house with the child, had gone outside for a few minutes, and then had come back indoors to find Jason lying on the floor choking on a piece of bread.

Maxine Palmer, the defendant's ex-wife, testified that during their marriage the defendant had shown little interest in their children and little affection towards them. He had whipped them too hard, had once hit their two-month-old child in the stomach, and had once put a gun to the head of their six-month-old child. Maxine Palmer also testified that she had been present with her aunt, Grace Johns, when she spoke with Florine Palmer shortly after the child's death. She was permitted to testify that Grace Johns had told her that Florine Palmer had returned from outdoors to find the baby choking.

The jury deliberated for about 6½ hours before returning the guilty verdicts. The defendant's post-trial motion was denied. The presentence investigation revealed that the defendant had no prior record, other than juvenile and traffic offenses. He had 10 years of formal education and received an honorable discharge from the Marine Corps after four years of service. At the sentencing hearing, the defendant reasserted his innocence.

The defendant's first contention in this court is that his murder conviction must be reversed because the circumstantial evidence presented failed to prove that he inflicted the fatal injuries on the child. He relies on the often-stated rule that for a homicide conviction to be upheld where the evidence against the accused is solely circumstantial, his guilt must be so thoroughly established as to exclude every other reasonable hypothesis. (*People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753; *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651; *People v. Willson* (1948), 401 Ill. 68, 81 N.E.2d 485.) The defendant points out that the child was not in his exclusive care and custody during the crucial time period, and that other people had the opportunity to inflict the fatal injuries. He argues that there is no evidence of record that he inflicted any injuries to the top of the child's head. Further, according to the defendant, the testimony of Mrs. Bruce must be viewed with suspicion, because at the time of trial she was facing charges of cruelty to children and endangering the health and life of a child. The defendant compares the instant case to *People v. Frost* (1977), 47 Ill. App. 3d 767, 362 N.E.2d 417.

The State responds that where the reasonable inferences to be drawn from the circumstantial evidence inculpate the defendant, the jury's verdict must stand unless a reasonable alternative explanation of the evidence raises a well-founded doubt of guilt, citing this court's opinion in *People v. Morgan* (1976), 44 Ill. App. 3d 459, 358 N.E.2d 280. The State urges that the only person pointed to by all of the evidence of record is the defendant. Florine Palmer and Catherine Bruce, the other two people who arguably had the opportunity to inflict the fatal injuries, were together during the hour that the child spent alone with the defendant on Friday evening. It was during this period that the child received a split lip and a bruise under his eye. The defendant refused to explain these injuries to Mrs. Bruce.

The most telling aspect of the circumstantial evidence of the defendant's guilt, the State argues, is the unexplained delay in taking the child to the hospital, together with the story related by the defendant—physically impossible according to the pathologist—that the child had choked on a ham and cheese sandwich. The State concludes that the compelling inference from these facts is that the defendant, realizing the seriousness of the situation he was in, used the unexplained time prior to arriving at the hospital to concoct the story about Jason choking, and to insert some bread into the child's throat. This act of fabricating evidence, the prosecution urges, demonstrated the defendant's consciousness of, and constituted substantive evidence of, his guilt, citing *People v. Smith* (1972), 3 Ill. App. 3d 958, 279 N.E.2d 512. Where no other reasonable hypothesis consistent with the facts of record and the defendant's innocence was presented to the jury, the State argues, the jury's verdict must stand.

We agree with the State that the instant case is distinguishable on its facts from *People v. Frost*, cited by the defendant for the proposition that mere opportunity to commit a homicide is not sufficient proof to sustain a conviction. In *Frost*, the appellate court found that there had been no direct evidence presented to the jury indicating that the defendant had committed any harmful act directed toward the deceased, and further that all of the evidence reflected that the defendant and the deceased had a mutually affectionate relationship. Here, however, the defendant admitted that he had bitten and spanked the child, and there was other evidence tending strongly to show that he had bruised and injured the child. The jury also had before it Mrs. Bruce's testimony that she felt that the defendant did not really want Jason with him, as well as his ex-wife's testimony as to his cruel treatment of their children. Clearly more than mere opportunity to commit the offense was proved.

■■ The rule that all other reasonable hypotheses must be excluded by the proof does not require that the defendant's guilt need be proved

beyond any possibility of a doubt. (*People v. Branion* (1970), 47 Ill. 2d 70, 265 N.E.2d 1, and cases cited therein; *People v. Frost*; *People v. Morgan*.) What is required is that the "proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." (*People v. Marino* (1970), 44 Ill. 2d 562, 580, 256 N.E.2d 770, 780, and cases cited; *People v. Morgan*.) The jury is not required to search out potential explanations compatible with innocence and elevate them to the status of a reasonable doubt; nor is the jury required to believe the defendant and the witnesses called on his behalf, especially where there is a possibility of bias. (*People v. Morgan*, 44 Ill. App. 3d 459, 466, 358 N.E.2d 280, 286, and cases cited.) As our supreme court said recently in *People v. Foster* (1979), 76 Ill. 2d 365, 373-74, 392 N.E.2d 6, 9:

> " 'This court has often held that it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. [Citations.] Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact. [Citation.]' (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99.) Nor has the State failed to exclude every reasonable hypothesis consistent with innocence. (*Cf., e.g., People v. Garrett* (1975), 62 Ill. 2d 151, 163.) The State may exclude the defendant's theory by introducing evidence which indicates that the defendant is lying, because the jury is not required to believe the defendant. (*People v. Heflin* (1978), 71 Ill. 2d 525, 533-34.) Rather, time after time, this court has articulated the following standard: 'The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt.' (*People v. Bernette* (1964), 30 Ill. 2d 359, 367; *People v. Marino* (1970), 44 Ill. 2d 562, 580; *People v. Williams* (1977), 66 Ill. 2d 478, 485.)"

After closely scrutinizing the evidence presented to the jury in this case, we have reached the conclusion that the standard articulated by the supreme court was satisfied. The State wove a strong web of circumstantial evidence. The jury was left with no reasonable and well-founded doubt as to the defendant's guilt.

In light of all the evidence of record, it would not have been reasonable for the jury to conclude that Jason Bruce's death was caused by his falling, or by his choking on a sandwich, or by his being beaten over the head by anyone other than the defendant. No reasonable hypothesis was presented to the jury to account for the delay in getting

the child to the hospital, other than that the defendant was seeking to conceal his guilt. The jury believed the State's witnesses and did not believe the testimony of the defendant and his relatives. That was the jury's prerogative, and we may not substitute our judgment for theirs. We therefore reject the contention that the evidence presented failed to prove beyond a reasonable doubt that the defendant inflicted the fatal injuries.

The defendant next urges that his murder conviction cannot stand because there was no evidence that he acted with the intent to kill or do great bodily harm to Jason Bruce. At most, the defendant argues, the evidence shows recklessness sufficient to support an involuntary manslaughter conviction.

Section 9—1(a)(2) of the Criminal Code, under which the murder charge in this case was brought, provides in pertinent part as follows:

> "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> ❋ ❋ ❋
>
> (2) He knows that such acts create a strong probability of death or great bodily harm ❋ ❋ ❋." Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2).

■■ For a jury to conclude that an accused was "consciously aware" that death or great bodily harm was "practically certain to be caused by his conduct" (see Ill. Rev. Stat. 1977, ch. 38, par. 4—5(b)), it need not, and indeed seldom does, have before it direct proof of the defendant's mental state. Instead, the law permits the jury to infer from the character of the defendant's acts that he knew or should have known that his conduct would create a strong probability of death or great bodily harm. (*People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455.) As the supreme court stated in *People v. Muir* (1977), 67 Ill. 2d 86, 93, 365 N.E.2d 332, 336, *overruled in part on other grounds by People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28:

> "Acts that fall within section 9—1(a)(2) are those the natural tendency of which is to destroy another life. (*People v. Davis* (1966), 35 Ill. 2d 55; *People v. Latimer* (1966), 35 Ill. 2d 178.) Thus, if an assailant fires a pistol at a person, he knows that his act, if the bullet strikes a vital organ, creates a strong probability of death or, if it does not strike a vital organ, the act at least creates a strong probability of great bodily harm."

The jury in the instant case was properly instructed both as to murder under section 9—1(a)(2) and involuntary manslaughter under section 9—3 (Ill. Rev. Stat. 1977, ch. 38, par. 9—3).

To make the distinction between the section 9—1(a)(2) type of murder and involuntary manslaughter necessarily requires a factual

determination as to the degree to which the acts which the defendant performed created the likelihood or probability of death or great bodily harm. (See *People v. Johnson* (1975), 33 Ill. App. 3d 168, 174, 337 N.E.2d 240, 243-45, and authorities cited therein.) As the court said in *Johnson*, "Whether the particular acts of the defendant create a 'strong probability' of death or great bodily harm or whether they are 'likely' to cause death or great bodily harm is a question of fact to be decided under all the circumstances as presented to the trier of fact." 33 Ill. App. 3d 168, 174, 337 N.E.2d 240, 243-45.

■■ The jury in the instant case had before it expert testimony tending to show that the victim, a 22-month-old child, was hit over the head with a large blunt object at least a dozen times. Such acts have a natural tendency to take human life. The inference that the defendant should have known that there was a strong probability that the child would die or suffer great bodily harm because of those acts was clearly not against the manifest weight of the evidence.

The defendant next contends that the court erred in permitting Alice Perry to testify on rebuttal as to the substance of the conversation she had overheard between Catherine Bruce and Florine Palmer, in which Mrs. Palmer allegedly stated that "she didn't know what got into Wally" and "she didn't know why he done it." It is argued that this testimony was hearsay and was not proper rebuttal evidence because it did not repel, explain, contradict, or disprove any of the evidence presented in the defendant's case in chief. This issue was not raised in the defendant's post-trial motion, and therefore we may properly treat it as waived on appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) However, since the defendant contends here that the introduction of this testimony so prejudiced him as to deny him his right to a fair trial, we will examine the issue briefly to determine whether or not admission of the testimony can be considered plain error.

■■ The defendant argues that the testimony in question was hearsay in that it was offered to prove the truth of the matters asserted, not merely to show that Mrs. Palmer made the statements. The State responds to the contrary that it was properly admitted to impeach Mrs. Palmer. We think it clear that the evidence did impeach the general thrust of Mrs. Palmer's testimony, and thus was proper rebuttal for that purpose. The question still remains, however, whether the testimony as to the statement implicitly inculpating the defendant was actually offered with the intention that the jury consider the statement as substantive evidence, rather than as mere impeachment. (See *People v. Strubberg* (1978), 61 Ill. App. 3d 521, 378 N.E.2d 191, 196.) In light of the facts that the jury was instructed that evidence of a prior inconsistent statement was to be considered only in determining the weight to be given to the witness'

testimony, that the defendant requested no contemporaneous limiting instruction, and that Mrs. Palmer was present at trial and testified and was available to be called on surrebuttal, we conclude that admission of this evidence, if error, was not plain error. We therefore treat the issue as waived.

The defendant further contends that rebuttal testimony as to his reputation in the community was improperly admitted because the witnesses based their opinion not on general knowledge obtained in the community, but rather on investigations and opinions as to the defendant's reputation after the instant charges had been filed against him. As this issue was neither raised at trial nor in the defendant's motion for new trial, we consider it waived.

The defendant next contends, relying on *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, that his aggravated battery convictions must be vacated because based on the same physical acts on which the murder conviction was based. We agree, however, with the State that the multiple convictions were proper here, where each count of the information was supported by proof of distinct conduct by the defendant temporally distinct from the conduct supporting each of the other charges. This is not an instance "where more than one offense is carved from the same physical act." *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844.

Finally, the defendant contends that his sentence should be reduced because it does not adequately provide for his possible rehabilitation, in light of his history and character. Because of the nature and circumstances of the instant offense, we cannot hold that the trial court abused its discretion in imposing the sentence of 100 to 150 years for murder. In any event, as we have previously noted in *People v. Henderson* (1977), 45 Ill. App. 3d 798, 359 N.E.2d 909, where a minimum sentence of at least 20 years is clearly justified, the actual minimum is of no legal consequence, as the defendant will be eligible for parole under the provisions of section 3—3—3 of the Unified Code of Corrections after serving 20 years less time credited for good behavior (Ill. Rev. Stat. 1977, ch. 38, par. 1003—3—3).

For the foregoing reasons, the defendant's conviction and sentences are affirmed.

Affirmed.

KARNS, J., concurs.

Mr. JUSTICE KASSERMAN, dissenting:
I cannot agree with the conclusion of the majority in which it is

determined that the evidence in this cause is sufficient to establish that the defendant is guilty of murder.

In *People v. Johnson* (1964), 54 Ill. App. 2d 27, 33, 203 N.E.2d 283, the court stated:

> "The Criminal Code of 1961 [Ill. Rev. Stat. 1977, ch. 38, pars. 9—1, 9—2 and 9—3] provides that a person who kills an individual without lawful justification commits murder; that a person who kills an individual without lawful justification, if at the time of the killing he is acting under a sudden and intense passion, resulting from serious provocation by the individual killed, commits voluntary manslaughter; and that a person who kills an individual without lawful justification commits involuntary manslaughter, if his acts, whether lawful or unlawful, which cause the death, are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

The court in *Johnson* pointed out that in the case of voluntary manslaughter, the act of the defendant is done intentionally or knowingly and concluded: "Intent to kill is not an element of involuntary manslaughter. Involuntary manslaughter is an offense which happens without the intent to inflict injury and death results from acts performed recklessly." *Johnson*, 54 Ill. App. 2d 27, 36; *cf. People v. Post* (1966), 78 Ill. App. 2d 121, 223 N.E.2d 238.

It is my conclusion in the instant case that the evidence fails to establish that the defendant performed the acts resulting in the death of Jason Bruce with the knowledge such acts create a strong probability of death or great bodily harm as required by section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2)). To the contrary, in my opinion the evidence indicates that the acts of the defendant constitute involuntary manslaughter as defined in section 9—3(a) of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 9—3(a)).

For the foregoing reasons, I would reduce the defendant's conviction to involuntary manslaughter and remand the cause for a new sentencing hearing.