THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DWIGHT BATTLES, Defendant-Appellant.

First District (1st Division)    No. 79-1605

Opinion filed March 2, 1981.

James J. Doherty, Public Defender, of Chicago (Timothy K. McMorrow, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Noble Nacev, and John R. Ashenden, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Dwight Battles, was convicted by a jury of the murder of his two infant daughters, Audrey and Stephanie, aged 2 and 3 years respectively, and was sentenced to two concurrent terms of 40 to 80 years. Defendant appeals, contending (1) he was not guilty of murder, but only of involuntary manslaughter, and (2) the State's final argument to the jury was inflammatory and prejudicial and constituted reversible error.

Defendant and his wife, Brenda Jones, had four children, two boys and two girls. The boys lived in a foster home. The two girls, Audrey, 2, and Stephanie, 3, lived with their parents. In January 1977, Brenda Jones separated from defendant and took her two daughters with her. In early June of 1977, she and her daughters were staying with her friend, Buanita Hughes, at the latter's home. On June 19, 1977, Brenda Jones left the two little girls with Buanita Hughes, who agreed to take care of them. The children were well fed and in good physical condition while Buanita Hughes cared for them. On June 29, 1977, because she had business to attend to which would take "a couple of days," Buanita Hughes took the two little girls back to their father's apartment and asked him to look after them until she returned to get them on July 2. Defendant said he couldn't take care of them. She said, "You are going to watch them." He said, "Whatever happens, happens." She left them well fed and unbruised with defendant.

Three days later, on July 2, 1977, she returned to defendant's house with her sister. She knocked on the back door and, when she did not receive an answer, she knocked on the front door, placed her ear to the door and "heard this little moaning sound." She told her sister there is a "funny sound in there, I should break a window." Her sister told her not to; she could be charged with breaking and entering. She and her sister then drove home.

Beverly Pender lived next door to defendant's apartment. On July 4 she moved out of her apartment. On July 6, she returned on a visit and noticed an odor in the hallway between her old apartment and defendant's. At 11:00 that night she again returned to the building to drop off her friend. She noticed several people sitting outside, including defendant, who was on the front porch drinking beer. She returned to the building on Saturday, July 9, and noticed defendant sitting in front of his apartment. She also noticed that flies covered the inside of the front window of defendant's apartment.

On July 9, Police Officer Robert Christian responded to a call to go to defendant's apartment. He noticed the strong odor of a decomposing

body. A resident broke a window, entered defendant's apartment and opened the door for him. He saw the body of an unclothed child, swollen from bruises about the face and on the lower extremities. Maggots were crawling throughout the body. Further investigation disclosed a chesthigh freezer blocking the entrance to a bedroom just off the kitchen. The more decomposed body of a second child was found in that bedroom.

About that time, defendant arrived with some people in an automobile. Defendant was taken into the apartment to identify the bodies. He identified Audrey in the bedroom next to the kitchen and, when told that the body of another child was in the front bedroom, he said, "I have seen enough, my other daughter is in there." Defendant was advised of his constitutional rights, driven to the police station and again advised of his constitutional rights.

There, defendant said that he understood his *Miranda* rights and wanted to make a statement at that time. In his statement, which he signed after acknowledging it was made without any threats or promises, he said: His wife had a friend drop the children off on Wednesday, the 29th of June. He told them (the kids) to come into the house and Buanita Hughes left. It was late in the evening and he told them to get to bed. There was no food; there was no gas, no power at all, so he could not feed them. He went to look for their mother. After he came back, he gave them some water and they went to sleep. On Thursday morning, when he got up he checked the kitchen and the children were lying down. He gave them some more water and went out and drank all day and most of the night. He didn't remember if he came home Thursday or Friday at all. He remembered waking up Friday evening and they were in the room playing and talking together. He thinks he might have struck them on their butts because they were out of bed. Normally he would not whip them at all, but he may have hit them more because he was doing a lot of drinking. He had told his wife that she would have to whip them normally, because his hand is too heavy. He went out again Friday and did some more drinking and did not come home until about 2:30 a.m. Saturday. He went past their room and they seemed like they were sleeping. He went to bed and woke up about 10 a.m. He checked the children and they were not moving. He thought that he stayed in the house until about 4 p.m. The children did not say anything. He went out looking for his wife. About midnight, he saw his father, who gave him two dollars after he fixed his father's flat tire. He then took the bus home. The children were asleep in the one bedroom. The oldest girl had been out; things were knocked over.

He went to bed and woke up Sunday morning; he didn't know at what time. He went to get some bread at the store, but they were all sold out because of the holiday. He got some candy and tried to give it to

them, but they would not take it. He gave them some water, some more water because they were looking bad. Monday he gave them some more water and they were pretty quiet. They were falling out of bed a lot.

On Monday he told an Ellen Rose that one of the children was dead and the other was in bad shape. He went out looking for his wife. On Tuesday he could not think about anything because he was scared. He knew the baby had died and he didn't know what to do. On Wednesday he walked over to his Aunt Cookie and just sat there. He knew both daughters were dead on Tuesday when he left. He was just trying to get out of the house.

Defendant also stated, "They fell out of bed and I may have hit them, I just don't know what happened."

On July 10, 1977, defendant, after being fully advised of his rights, made another statement to Assistant State's Attorney Brian Collins, with a court reporter present. Defendant signed this statement, too. Defendant stated he had had an argument with his wife and she left with the two children. The argument was "about money and I slapped my little daughter. My wife said 'don't be spanking with your hands, they're too heavy.' " Approximately 10 days later, on Wednesday evening June 29, 1977, Buanita Hughes dropped his children off at defendant's apartment. His daughters slept that night. The next morning defendant gave them some water and then left. He went drinking with his friends and had about 12 cans of beer. On Friday morning defendant's children told him that they were hungry. He did not feed them. Defendant spent all day Friday sitting on the front porch with some friends. He smoked cigarettes and drank a six-pack of beer. If his daughters were crying on Friday, he did not hear them because he was sitting outside on the porch. On Friday night he watched T.V. at the apartment and then fell asleep.

On Saturday he woke up at 10 a.m. He noticed that the girls had rolled off the bed. He put them back in bed and told them to stay there; they continually fell out of their bed and he spanked them for falling off the bed. He did not feed them on Saturday. He spent most of that day sitting in front of the house. Defendant's father gave him one dollar for fixing a flat tire. Defendant then left the front porch and did not return until 1:30 a.m. Sunday. He found some rice in the kitchen, boiled it; the children would not eat.

On Sunday defendant went to a bar. The children slept all day Sunday. On Monday, July 4, defendant's aunt came to invite him to a barbecue. He went to a friend's house, played cards, drank beer and ate chicken. Defendant then went to the barbecue at his aunt's house and stayed there until 9 p.m. He did not take his little girls to the aunt's barbecue because they were sick and would not move. He did not bring

the girls any chicken because he did not want "to bother my family with helping me out." He went home and fell asleep while watching T.V.

On Tuesday morning defendant noticed that his smallest child, Audrey, "looked like she was dead." Both girls were lying in the same bed. Stephanie told him she wanted to leave the bedroom. He told her to stay in the bed with Audrey, who already appeared to be dead. He then pushed the refrigerator in front of the bedroom door to prevent Stephanie from leaving the bedroom and then went looking for a friend. He went to a bar and had a few beers. He told no one that his daughter Audrey was dead.

Defendant's friend gave him $17 for an electric fan defendant was not using. Defendant bought a six-pack of beer. He did not buy food for Stephanie. He decided to shoot dice with the remainder of the money, lost $11 and gave $2 to his partner. He used the remaining money for cab fare.

When he returned home later that evening, he found that Stephanie "had climbed over the freezer that I had put in front of the bedroom door." She was lying "still" in the front bedroom.

He spent Wednesday and Thursday nights at his aunt's house, but did not tell his aunt or his mother that his two daughters were dead. He drank beer on Thursday and Friday and was arrested on Saturday.

He again stated that he did spank both of the children for falling off the bed.

Doctor Robert Stein, the chief medical examiner of Cook County, testified that on July 11, 1977, he examined the bodies of Audrey and Stephanie Battles. The external examination of Stephanie Battles, age 3, revealed numerous bruises over the abdomen, the chest, the back and lower extremities and on the face. The child's tongue was protruding and this protrusion could have resulted from manual strangulation of the deceased. The internal examination revealed hemorrhaging present around the muscles of Stephanie Battles' neck. The internal examination further revealed the absence of food in the stomach and the absence of formed stool in the lower part of the large intestine. The doctor believed that the primary cause of the death of Stephanie was "multiple injuries which were traumatic." The secondary cause was inanition (starvation).

His external examination of Audrey Battles revealed bruises over the chest, the abdomen, the back and the arms. Some of the child's teeth were missing. The discoloration found all over the child's body was due to bruising. The internal examination revealed hemorrhaging around the neck. The vertebrae in the neck region were separated. The doctor believed that the injury could have been due to "grasping a child by the head" * * * "giving an upward jerking motion, thusly [indicating], could

have produced that separation." His opinion as to the cause of death within a medical degree of certainty: "Multiple injuries were the cause of death." The secondary cause was starvation. He found no broken bones in either child.

The defense presented no evidence.

Defendant argues that he was not proved guilty of murder beyond a reasonable doubt, but only of involuntary manslaughter. We disagree.

Murder is defined (Ill. Rev. Stat. 1977, ch. 38, par. 9—1):

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter."

Involuntary manslaughter is defined (Ill. Rev. Stat. 1977, ch. 38, par. 9—3):

"(a) A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving of a motor vehicle, in which case the person commits reckless homicide."

■■ Defendant's argument that the evidence shows merely recklessness on his part is unpersuasive; indeed, defendant's conduct (beating and starving his infant daughters over a period of four to five days) falls squarely within the language of section 9—1: "He knows that such acts create a strong probability of death or great bodily harm to that individual * * *." From these acts the jury could properly infer that defendant knew or should have known that his conduct would create a strong probability of death or great bodily harm. (*People v. Palmer* (1979), 76 Ill. App. 3d 1014, 1025, 395 N.E.2d 713, which involved the murder by beating of a 22-month-old boy; *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455, in which the court refused to reduce a charge of murder to involuntary manslaughter where defendant's 14-month-old son died from being struck by defendant.) The evidence set out above overwhelmingly established defendant's guilt of murder.

■■ Defendant also contends that he is entitled to a new trial because of the prejudicial and inflammatory nature of portions of the prosecution's

final argument. We disagree. We have carefully examined the record and the arguments to which objection is made and find, in view of the overwhelming evidence against defendant, that although it would have been better if some of the comments had been left unsaid, their omission would not have resulted in a different verdict. Other comments were legitimate comments. If any error was committed, it was harmless beyond a reasonable doubt. *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726; *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Skorusa* (1973), 55 Ill. 2d 577, 585, 304 N.E.2d 630.

The convictions and sentences are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.